1

# ORIGINAL

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  -------------------------------------------------------X
   DAVID ATTALI,
3
                                        PLAINTIFF,
4
           -against-                    Case No.:
5                                       15 CV 426
                                        (AT)(HBP)
6
   CITY OF NEW YORK, P.O. CHRISTOPHER DELBROCOLO, P.O.
7  JOSEPH BENEDUCE, P.O. BRENDAN SULLIVAN, P.O. PHILLIP
   MIRANDA, P.O. "JOHN" DRUMMY, DEPUTY INSPECTOR KEVIN
8  BURKE, SGT. ALEX PORCELLI, SGT. FELIX SANTANA, and LT.
   DAVID CHANG, Sued In Their Individual And Official
9  Capacities,

10                                      DEFENDANTS.
   -------------------------------------------------------X
11

12                           DATE: November 14, 2016

13                           TIME: 9:23 a.m.

14

15       DEPOSITION of the Plaintiff, DAVID ATTALI, taken by

16   the Respective Parties, pursuant to a Notice and to the

17   Federal Rules of Civil Procedure, held at the offices of

18   New York City Law Department, 100 Church Street, New

19   York, New York 10007, before Anna Vortsman, a Notary

20   Public of the State of New York.

21

22

23

24

25

```
 1    A P P E A R A N C E S:

 2

 3    AVALLONE & BELLISTRI
           Attorneys for the Plaintiffs
 4         DAVID ATTALI
           3000 Marcus Avenue, Suite 3E07
 5         Lake Success, New York 11042
           BY: ROCCO G. AVALLONE, ESQ.
 6                       &
               CHRISTOPHER F. BELLISTRI, ESQ.
 7

 8
      ZACHARY W. CARTER, ESQ.
 9    CORPORATION COUNSEL
      NEW YORK CITY LAW DEPARTMENT
10         Attorneys for the Defendants
           CITY OF NEW YORK, DEPUTY INSPECTOR KEVIN BURKE,
11         SGT. ALEX PORCELLI, SGT. FELIX SANTANA, and LT.
           DAVID CHANG
12         100 Church Street
           New York, New York 10007
13         BY: GERALD E. SINGLETON, ESQ.
           File No.: 2015-002890
14         Ctrl No.: 163711

15

16    WORTH, LONGWORTH & LONDON, LLP
           Attorneys for the Defendants
17         P.O. CHRISTOPHER DELBROCOLO, P.O. JOSEPH BENEDUCE,
           P.O. BRENDAN SULLIVAN, P.O. PHILLIP MIRANDA, P.O.
18         "JOHN" DRUMMY
           111 John Street, Suite 640
19         New York, New York 10038
           BY: MITCHELL GARBER, ESQ.
20

21              *              *              *

22

23

24

25
```

1   F E D E R A L   S T I P U L A T I O N S

2

3       IT IS HEREBY STIPULATED AND AGREED by and between

4   the counsel for the respective parties herein that the

5   sealing, filing and certification of the within

6   deposition be waived; that the original of the

7   deposition may be signed and sworn to by the witness

8   before anyone authorized to administer an oath, with the

9   same effect as if signed before a Judge of the Court;

10   that an unsigned copy of the deposition may be used with

11   the same force and effect as if signed by the witness,

12   30 days after service of the original & 1 copy of same

13   upon counsel for the witness.

14

15       IT IS FURTHER STIPULATED AND AGREED that all

16   objections except as to form, are reserved to the time

17   of trial.

18

19               *       *       *       *

20

21

22

23

24

25

D. ATTALI

1   D A V I D   A T T A L I, called as a witness, having been

2   first duly sworn by a Notary Public of the State of New

3   York, was examined and testified as follows:

4            THE REPORTER:  Please state your name for the

5        record.

6            THE WITNESS:  David Attali.

7            THE REPORTER:  What is your address?

8            THE WITNESS:  10 Hillside Avenue, Apartment 1,

9        Englewood, New Jersey.  07631 is the ZIP code.

10   EXAMINATION BY

11   MR. SINGLETON:

12       Q.   Good morning, Mr. Attali.

13       A.   Good morning.

14       Q.   Before we get started, I'm going to just

15   explain some ground rules.

16            Have you ever been deposed before?

17       A.   No.

18       Q.   So you have to answer with audible responses,

19   yes or no.  No head shakes, no nods, no "uh-huh."

20            If you don't understand a question, I can

21   rephrase the question.  If you don't ask me to rephrase

22   it, I'll assume you understand it, and I'll expect you

23   to answer it.  Your attorney can make objections, but

24   unless he instructs you not to answer, you'll answer the

25   question.

D. ATTALI

1           If you need to take a break at any time to

2     consult with your attorney, you may do so.  Except while

3     there is a question pending, you can answer the

4     question, and then consult with your attorney.

5           A.   Understood.

6           Q.   And if you need a break at any time, and the

7     court reporter as well, we'll take a break.  You know

8     where the restrooms are.

9           A.   Yeah.

10          Q.   Okay.  Did you do anything to prepare for this

11    deposition?

12          A.   No.

13          Q.   Did you review any documents?

14          A.   No.

15          Q.   Did you meet with your attorneys to discuss

16    what would happen today?

17          A.   No.

18          Q.   Are you taking any medications?

19          A.   No.

20          Q.   Have you taken any medications in the last

21    year?

22          A.   In the last year, no.

23          Q.   In the last two years?

24          A.   Yes.

25          Q.   What in the last two years?  Well, so you were

D. ATTALI

1   taking something more than a year ago but less than two

2   years ago, correct?

3       A.   I think so.

4       Q.   What were you taking?

5       A.   I think it was called -- I don't know how to

6   spell it -- Marzopin (phonetic).

7       Q.   And who prescribed that?

8       A.   Dr. Frank.

9       Q.   Goldberg?

10      A.   I believe so.

11      Q.   And what was that for?

12      A.   To help me sleep.

13      Q.   And how long did you take that?

14      A.   For about a month.

15      Q.   And did you stop taking it because of some

16  reason?

17      A.   I just felt I didn't need it anymore at that

18  point.

19      Q.   Where were you born?

20      A.   I was born in New York, Manhattan.

21      Q.   At Beth Israel Hospital?

22      A.   Yes.

23      Q.   On August 8th, 1983?

24      A.   Yes.

25      Q.   And you have dual citizenship in the United

D. ATTALI

1    States and Israel?

2        A.    Yes, I do.

3        Q.    And how did that come about?

4        A.    Well, at one point I went to Israel to visit,

5    and they have some type of rule there that if one of

6    your parents is a citizen, automatically you're granted

7    citizenship, and they gave me a passport.

8        Q.    And how many times have you been to Israel?

9        A.    More than seven times.

10       Q.    When was the first time you went?

11       A.    2001, in August.

12       Q.    And how long did you stay in 2001?

13       A.    I'm not sure exactly.  A few months.

14       Q.    And you were 18 at the time?

15       A.    Yes.

16       Q.    And it was for tourism and visit to --

17       A.    Yep, just to hang out.

18       Q.    And is that the longest you ever stayed there?

19       A.    No.  I don't think so.

20       Q.    And what's the longest you ever stayed on any

21   trip to Israel?

22       A.    I think, roughly, two years.

23       Q.    Do you have any military experience?

24       A.    Yes.

25       Q.    Okay.  Tell me about that.

D. ATTALI

1    A.    I was in an infantry unit, and that's about

2   it.

3    Q.    Infantry unit in Israel?

4    A.    Yes, in the IDF.  That's the Israel Defense

5   Force.

6    Q.    And what was your rank?

7    A.    Private.

8    Q.    Started as a private; ended as a private?

9    A.    Yes.

10   Q.    Was that paid service?

11   A.    Yes.

12   Q.    And did you receive training?

13   A.    Yes.

14   Q.    Describe the training.

15   A.    How to read maps, how to use weapons, and how

16  to dig golds.  Really, running all day.  That's about

17  it.

18   Q.    Did you see any action?

19   A.    No.

20   Q.    Tell me about your family.  How many brothers

21  and sisters do you have?

22   A.    I have three brothers, two are older and one

23  is younger, and I have two sisters.

24   Q.    Older, younger?

25   A.    One is older and one is younger.

D. ATTALI

1       Q.    Okay.  Your older brother is -- what's your

2   oldest brother's name?

3       A.    Ami.

4       Q.    And Ami is eight years older than you?

5       A.    I believe so.

6       Q.    And who comes next?

7       A.    My brother Hillel.

8       Q.    And Hillel is three years older than you?

9       A.    Yes.

10      Q.    And who comes next?

11      A.    Joseph.  Oh, wait.  Excuse me.  I have a

12   sister who is under my first brother.  Her name is

13   Tamar.

14      Q.    Tamar?

15      A.    Yes.

16      Q.    And she is five years older than you?

17      A.    Yes.

18      Q.    And then comes you?

19      A.    Yes.

20      Q.    And then comes Yossef?

21      A.    Yeah.

22      Q.    Two years younger?

23      A.    Mm-hmm.

24      Q.    And your younger sister?

25      A.    Yes.  Mira.

D. ATTALI

1    Q.   Mira?

2    A.   Yeah.

3    Q.   All right.  Let's start with Ami.  What does

4  he do for a living?

5    A.   He is an anesthesiologist.

6    Q.   And where does he live?

7    A.   In Detroit.

8    Q.   And Yossef?

9    A.   Yossef lives in Rockland and works in

10  construction.

11    Q.   And Hillel?

12    A.   He lives in Rockland County and he is a pilot.

13    Q.   Commercial pilot?

14    A.   No.  Small planes.

15    Q.   But he flies them for a living?

16    A.   I think so.

17    Q.   And Yossef -- I asked you about Yossef.

18         Tamar?

19    A.   My sister Tamar, she works here in the city,

20  but what she does exactly, I do not know.

21    Q.   And Mira?

22    A.   She is a nurse here in the city.  I don't know

23  which hospital, though.

24    Q.   Who is Nikki Attali?

25    A.   That's my sister-in-law.  Joseph's wife.

D. ATTALI

1    Q.    Describe for me your education.

2    A.    I left high school, tenth grade.  I did early

3    admission in Rockland Community College where I got an

4    AA in Liberal Arts and Social Sciences and did my GED at

5    the same time, and pretty much that's all the schooling

6    I had.

7         MR. SINGLETON:  Mark that as Defendant's

8         Exhibit B.

9              (Whereupon, the following document was marked

10         as Defendant's Exhibit B for identification as of

11         this date by the Reporter.)

12    BY MR. SINGLETON:

13    Q.    I'm showing you what I've marked as

14    Defendant's Exhibit B.  Is this a copy of your

15    transcript from Rockland Community College?

16    A.    Yes.

17    Q.    Have you ever seen that before?

18    A.    Yes.

19    Q.    Am I correct that this is a copy of your

20    transcript?

21    A.    Yes, it is.

22    Q.    And this shows that you attended Rockland

23    Community College over a period of, roughly, six years?

24    A.    Yes.

25    Q.    Did you take breaks?

D. ATTALI

1    A.   Yes.

2    Q.   And the reason?

3    A.   I don't know.  I don't recall why.

4    Q.   And you've taken a couple of courses in

5  Hebrew.  Do you speak Hebrew?

6    A.   Yes.

7    Q.   So you're fluent in it or no?

8    A.   Yes.

9    Q.   You are fluent.  Okay.

10        It shows that in the spring of 2001 you took a

11  course in weight training.  Is that body building?

12    A.   It was -- it was -- you just get credits for

13  going to the gym, and, you know, it just says --

14  everyone would make a line, "You do this machine," and

15  the next guy, you know, could play basketball, something

16  like that.  But it wasn't, you know -- like, you're

17  learning how to work out.

18    Q.   It was not?

19    A.   No.  It's an easy credit.

20    Q.   You passed that, one credit.

21        And it shows that in the fall of 2003 you took

22  body sculpting.  What was that about?

23    A.   The same idea.  It was pretty much -- it was

24  more like a yoga type of class.  It was the same idea.

25  You could go play basketball or pretty much any physical

D. ATTALI

1   activity and you get the credit.

2       Q.   Okay.  This transcript shows that, I guess,

3   from spring of 2003 you failed a couple of courses.

4   Well, four times.  And then in 2005, Ds.

5          Was there some reason why you were doing

6   poorly or just not a good student?

7       A.   Specifically, if I recall correctly, it was

8   the math classes.  I had trouble with the math.

9       Q.   Well, it does show you failed math, but it

10  shows you failed studies and short story, Hebrew 202,

11  English 102.  Any reason?  Were you having trouble

12  attending school?

13      A.   No.  It was just -- you know, for the math, I

14  just -- I'm not good at math.  And the short stories and

15  English literature, I just never understood the concept

16  of, you know, the classes and the stories they made you

17  read, and it was beyond me.

18      Q.   Could you describe for me your work experience

19  prior to becoming a police officer?

20      A.   Prior to becoming a police officer, I was

21  pretty much taking care of my grandmother.  That was

22  when she was in her 90s, early 90s.

23          Before that, I just worked in a few little

24  restaurants.  And in the summer, I was a lifeguard in,

25  maybe, two different day camps, depending on the summer.

D. ATTALI

1   I don't remember.  And that's about it.

2       Q.   Was there a point in time where you lived with

3   your grandmother?

4       A.   Yes.

5       Q.   That's Helen -- how do you spell it?

6       A.   Schroit, S-C-H-R-O-I-T.

7       Q.   And that was for, what, approximately a year?

8       A.   A few years.

9       Q.   Two years?

10      A.   Yeah.

11      Q.   She lived in a separate residence from your

12  parents?

13      A.   Yes.

14      Q.   And so what age did you live at home?

15      A.   Until I was, roughly, 19, 20.  Yeah.  But when

16  I left, I didn't leave for good.  I was either living by

17  my grandma or by my parents.

18      Q.   Do you have any kind of criminal history?

19      A.   No.

20      Q.   Do you recall getting arrested for harassment

21  and disorderly conduct in connection with a job you had

22  as a waiter?

23      A.   Yes, but I never considered it getting

24  arrested.  I just got a phone call saying, "Come down to

25  the police station."  And I gave him my version, and he

D. ATTALI

1     said, "Okay.  Go home and show up at court" --

2          Q.     Well, do you recall --

3          A.     -- "at a further date."

4          Q.     Do you recall pleading to disorderly conduct?

5          A.     No, I don't recall.  I recall the incident but

6     not the details with the lawyer and whatever happened.

7          Q.     Did you have counsel?

8          A.     I had a lawyer, yes.

9          Q.     Do you remember his name?

10         A.     No.

11         Q.     Do you remember how you went about getting

12    that lawyer?

13         A.     My mother.

14         Q.     Where were you working immediately prior to

15    applying to be a police officer?

16         A.     I wasn't at that time.  I was living with my

17    grandmother, just taking care of her.

18         Q.     And is she still alive?

19         A.     No.

20         Q.     And what year did she pass away?

21         A.     She passed away, I think, the third day that I

22    was in the police academy that we started.  Or was it

23    the fifth day?  I think the fifth day.  So that was in

24    July of 2008.  The exact day, I don't know.

25         Q.     So you were in the police academy for three

D. ATTALI

1    days when she passed away?  I'm sorry.

2         A.    Three or five days.  One of those two, yes.

3         Q.    And at the time you entered the police

4    academy, your brother Hillel was an officer already?

5         A.    I don't -- I think -- no, he was not.

6         Q.    Do you recall when he became a police officer?

7         A.    No.

8         Q.    How long was he a police officer?

9         A.    The exact amount of time he was a police

10   officer, I don't know.

11        Q.    Approximately.

12        A.    Maybe three years, I think.

13        Q.    If I told you he joined the force in 2005,

14   would that refresh your recollection?

15        A.    I suppose.  I don't know.

16        Q.    When did you enter the academy?

17        A.    July 2008.

18        Q.    Was your brother still on the job when you

19   entered the academy?

20        A.    No.

21        Q.    He had already retired?

22        A.    I believe so.

23        Q.    If I told you he went out on three-quarters

24   disability in February of 2008, does that sound right?

25        A.    Yes.

D. ATTALI

1    Q.    And how long were you in the academy?

2    A.    For six months.

3    Q.    Could you describe the training you received

4    in the academy?

5    A.    Yes.  Pretty much I would say it was -- we

6    spent most of the time in the classroom.  I believe my

7    instructor was Officer Gerando, and we were just going

8    over, you know, your daily activities as a police

9    officer, how to respond, how to deal with people, you

10   know, certain things that you don't do to offend

11   somebody.  We had the gym training, a lot of running,

12   and, yeah, that's about it.

13   Q.    Are you employed today?

14   A.    Yes.

15   Q.    Where are you employed?

16   A.    I'm self-employed.

17   Q.    Self-employed doing what?

18   A.    Property preservation.

19   Q.    Tell me what that entails.

20   A.    So it entails -- basically, we work on

21   foreclosures.  So the banks, through another

22   preservation company, which is the middle man, so to

23   say, will give us a list of homes, whether they've been

24   foreclosed for seven weeks or seven years.  And we're

25   the first people to come in, and we give the banks an

D. ATTALI

1    assessment and -- an assessment and an estimate on what

2    to do to get the house market-ready again.

3            So if we need to get a Dumpster, we get a

4    Dumpster or sub out, you know, if we need new floors.

5    Or if there is a leak, we get a plumber.  So that's what

6    we do.

7        Q.   And you hire people, then, to do whatever,

8    necessary repairs?

9        A.   Yes.

10       Q.   So you're self-employed.  Anybody else work

11   with you?

12       A.   No.

13       Q.   And how long have you been doing that?

14       A.   Since last October, so it would be a year -- a

15   year and two months-ish.

16       Q.   October '15 to the present?

17       A.   Yes.

18       Q.   So in a year and a month, how much have you

19   made in that employment?

20       A.   That's a good one.  An exact number, I don't

21   know, but -- do you want me to kind of guesstimate?

22       Q.   Well, if you can estimate with reasonable

23   certainty.

24       A.   Okay.  I'll say probably about $43,000 a year.

25       Q.   $43,000?

D. ATTALI

1     A.   Yeah.

2     Q.   Did you file a tax return last year that --

3     A.   Yes, I did.

4     Q.   -- showed what you made?

5        Were you employed in any other capacity last

6  year, in 2015?

7     A.   Yes.

8     Q.   Doing what?

9     A.   I worked for a property management company for

10  a few months, in the Bronx.

11    Q.   What was the name of the company?

12    A.   New Amsterdam Property Management.

13    Q.   Doing the same kind of thing you're doing now?

14    A.   No, no.  It was more -- just manage buildings.

15  Specifically, my task was to take City violations off of

16  the buildings.  So, you know, I get a building and I

17  have a bunch of violations from lead to mold.

18       So we would start with the most serious

19  violations and -- like, the lead and the mold, and we'd

20  get, you know, whoever, a lead specialist or a mold

21  removal company to come and take it off.  Then we have

22  to get it certified by the City.  The housing inspectors

23  come, and then, you know, you slowly remove all the

24  violations from certain buildings.

25    Q.   And how long did you work for New Amsterdam

D. ATTALI

1  Management?

2        A.   I would say five months.  Maximum six, I

3  believe.

4        Q.   And did you have a title?

5        A.   Assistant property manager.

6        Q.   And you had that title when you started and

7  when you finished?

8        A.   Yes.

9        Q.   Do you recall what you were making in that

10  job?

11        A.   I was making $2,000 a month -- $2,300.  Excuse

12  me.

13        Q.   $2,300 a month?

14        A.   Yeah.

15        Q.   Gross?

16        A.   Yeah.

17        Q.   So you started that job, approximately, in

18  March of 2015?

19        A.   Mm-hmm.  Sounds about right.

20        Q.   No "mm-hmm."  You've got to say "yes."

21        A.   Yes.  I'm sorry.  Yes, sounds about right.

22        Q.   And what did you do prior to that?

23        A.   Prior to that, nothing.  I think I worked for

24  a water company for literally, like, a week or two.  The

25  company's name, I don't remember, but, basically, I just

D. ATTALI

1    drove around, and they did the water meter inspections.

2        Q.    And prior to that?

3        A.    Prior to that, nothing.  It was the police

4    department.

5        Q.    And tell me, do you -- how would you describe

6    your health today?  Good?

7        A.    Very good.

8        Q.    And do you work out?

9        A.    Yes.

10       Q.    You lift weights?

11       A.    Yes.

12       Q.    Do you still ride a motorcycle?

13       A.    No.

14       Q.    When did you stop riding?

15       A.    A long time ago.

16       Q.    After you got married?

17       A.    Yeah.  I don't recall.

18       Q.    How long did you ride?

19       A.    Oh, since 16 years old.

20       Q.    And you were riding while you were employed as

21   a police officer, correct?

22       A.    Yeah.

23       Q.    And you rode to the precinct every day?

24       A.    No, not every day.

25       Q.    How often?  Four days a week?

D. ATTALI

1     A.    No, not even.  Once in a blue moon.

2     Q.    What kind of bike did you have?

3     A.    I had a Harley Sportster.

4     Q.    How many CCs?

5     A.    883.

6     Q.    And your brother Hillel rides a bike, too,

7  correct?

8     A.    Yeah.

9     Q.    Did you ever ride with him?

10    A.    No.

11    Q.    Have you ever discussed this case with anyone

12  other than your attorney?

13    A.    With my wife a bit but not too much in detail.

14    Q.    Any other -- any family members?

15    A.    No.  They just -- they kind of know from the

16  news, you know.  I said, "Hey, I have a lawsuit," but

17  nothing in detail with what I discuss with my attorneys.

18    Q.    Do you have a regular family doctor?

19    A.    No.

20    Q.    You have medical insurance now through

21  Connecticut General, CGI?

22    A.    Cigna.

23    Q.    Cigna?

24    A.    Yes.

25    Q.    And is that through your wife?

D. ATTALI

1    A.   Yes.

2    Q.   And is your wife employed?

3    A.   Yes.

4    Q.   Where is she employed?

5    A.   Israel Discount Bank.  That's here in the

6  city.  The address, I don't know.

7    Q.   Do you know what her position is?

8    A.   No.

9    Q.   But you're covered under her plan?

10   A.   Yes, I am.

11   Q.   And you mentioned Dr. Goldberg?

12   A.   Yes.

13   Q.   Over what period of time did you see

14  Dr. Goldberg?

15   A.   Dr. Goldberg, specifically, I believe I only

16  saw him one time, possibly two, but I'll just say one.

17  When, the date, I don't know.

18   Q.   Is there a reason you never saw him again?

19   A.   Yes.

20   Q.   Why?

21   A.   Because -- well, initially, I saw him one

22  time, and that was it.  I didn't feel like I needed to

23  see him anymore.

24   Q.   And how was it that you came to see

25  Dr. Goldberg?

D. ATTALI

1      A.     I asked Cigna to give me a list of doctors

2  that accepted Cigna within my ZIP code, and he was just

3  the first on the list, so I called him.

4      Q.     What kind of doctor is he?

5      A.     He is a psychologist.

6      Q.     So why were you seeking a psychologist?

7      A.     I went to see him.  I was having trouble

8  sleeping at a certain point, because with this case and,

9  you know, speaking to my attorneys all the time, it kept

10  on just bringing things to my mind, you know, things

11  that I've been through with these officers.  You know,

12  you just sit in bed at night and just think about it

13  over and over.

14      Q.     And did that resolve itself over time?

15      A.     Yes, it did.

16      Q.     And today you sleep okay?

17      A.     Yes.  Mostly, the baby wakes me up, but, yes.

18      Q.     How old is the baby now?

19      A.     He is nine and a half months.

20      Q.     Congratulations.

21      A.     Thank you.

22      Q.     And the baby's name?

23      A.     Eli.

24      Q.     Putting aside doctors related to your shoulder

25  injury, have you seen any other doctors?

D. ATTALI

1      A.    Dawn Behar.  I'm not sure if her title is a

2  doctor or not, though.  She's, you know, an MD.  I call

3  her a doctor.

4      Q.    She is a psychologist?

5      A.    Therapist.

6      Q.    But not a physical therapist?

7      A.    No, no.  Yeah.

8            MR. AVALLONE:  "Yeah" what?

9            THE WITNESS:  Yes, she is a therapist, not a

10        physical therapist.

11           MR. AVALLONE:  Mental?

12           THE WITNESS:  Yes.

13  BY MR. SINGLETON:

14     Q.    Psychotherapist?

15     A.    Yes, I believe so.

16     Q.    And how long did you see her?

17     A.    I'd say over a year span.

18     Q.    Do you recall the period of time?

19     A.    Specific dates, no.  Maybe midway through 2014

20  into '15 or 2015.

21           (Whereupon, the following document was marked

22        as Defendant's Exhibit C for identification as of

23        this date by the Reporter.)

24  BY MR. SINGLETON:

25     Q.    I'm showing you what I've marked as

D. ATTALI

1    Defendant's Exhibit C.  It is progress notes which your

2    attorney provided in this case, and they are from Dawn

3    Behar.

4              Have you ever seen these before?

5        A.    No.  I have not seen them.

6        Q.    Well, they indicate that, apparently, your

7    first visit was October 2nd, 2014, and your last visit

8    was December 17th -- or the last entry was

9    December 17th, 2015.

10       A.    Yeah.

11       Q.    Does that sound right?

12       A.    I think I might've seen her an additional once

13   or twice after this date, after December 17th, 2015.

14       Q.    You think you might've seen her more recently?

15       A.    Yes, yes.  Maybe three months ago, because I

16   saw her after the baby was born.  I remember talking to

17   her about that.

18       Q.    And what occasion are you seeing her more

19   recently?

20       A.    I'm sorry.  Say that again.

21       Q.    What caused you to go see her more recently?

22       A.    Just to talk over stuff that I was going

23   through in the past.

24       Q.    Did she ever prescribe any medication for you?

25       A.    No.  I don't think she was able to.  That's

D. ATTALI

1    why I went to Dr. Frank.

2         Q.    Now, let me ask you:  You said you're doing

3    well now and sleeping well.

4              Do you like property management?

5         A.    The property management, I don't really like

6    too much; but the preservation, yes.

7         Q.    The current job?

8         A.    Yes.

9         Q.    You're enjoying that job?

10        A.    Yeah.  It's a bit more interesting than what I

11   did in the past.

12        Q.    Do you see any other doctors?

13        A.    No.

14        Q.    Now, you did see many doctors in connection

15   with your shoulder injury, correct?

16        A.    Yes.

17        Q.    We'll get to those in due course.

18              Let's go back to your training at the academy.

19        A.    Yes.

20        Q.    Do you recall getting training at any time --

21   the point in time about the patrol guide?

22        A.    Yes.

23        Q.    Tell me about that.

24        A.    We'd go over different procedures.  You know,

25   whether it's a use of force or what do you do with

D. ATTALI

1   prisoners, you know, as in -- if you're in the RMP with

2   a prisoner, you have to make sure that he is not sitting

3   behind the driver.  For example, he has to sit on the

4   opposite side.

5           And certain things, when you go to someone's

6   home on a call, you know, as I talk to you, not to look

7   at your watch to make it seem as if, you know, you're in

8   a rush to get of out there, and, you know, prisoner

9   escapes, and all forms of procedures you're doing, the

10   specific incidents, you know, whether it's a robbery or

11   alleged rape or those types of stuff, I suppose.

12      Q.   Did you have a copy of the patrol guide?

13      A.   Yes.

14      Q.   Was that a hard copy or was it a digital copy?

15      A.   It was a hard copy.

16      Q.   And did you refer to that from time to time?

17      A.   Yes.

18      Q.   Are you familiar with patrol guide procedures

19   on handling reports of workplace discrimination?

20      A.   No.

21      Q.   Did you ever have occasion to look at that?

22      A.   No.

23      Q.   Are you familiar with the patrol guide

24   procedure -- the patrol guide provision that prohibits

25   sexual, ethnic, racial, religious, or other

D. ATTALI

1  discrimination slurs through display of offensive

2  material?

3       A.   No.

4       Q.   Did you ever consult a patrol guide for

5  anything having to do with workplace discrimination?

6       A.   No, I did not.

7       Q.   Did you ever receive workplace training

8  regarding the department's Office of Equal Employment

9  Opportunity?

10      A.   I believe at one point we did.

11      Q.   Do you recall being given a 47-page handbook

12 outlining the NYPD's antidiscrimination policies and

13 complaint and reporting procedures?

14      A.   No.

15      Q.   You're saying you never got such a book?

16      A.   Maybe I did; maybe I didn't.  I just don't

17 recall.

18      Q.   Let me ask you:  Prior to joining the police

19 department, had you ever been the victim of anti-Semitic

20 marks?

21      A.   No.

22      Q.   Never?

23      A.   Not on a level of this.  Yes, I've heard it in

24 my life, you know, here and there, but not on a

25 consistent day-to-day basis.

D. ATTALI

1    Q.    You grew up in Rockland County?

2    A.    In Brooklyn, to start with.  And then, I

3    believe, possibly in 1992 or '93, we moved to Rockland.

4    Q.    When you were about ten or eight?

5    A.    Something like that.

6    Q.    Spring Valley or --

7    A.    Yes.

8    Q.    And then Suffern?

9    A.    Yes.

10   Q.    And when did you move back to the city?

11   A.    On and off, from 2002 on.  Like, all the

12   breaks between the college, I was by my grandmother.

13   Q.    What made you want to join the police

14   department?

15   A.    It's something I always wanted to do.  You

16   know, I saw it as a great job, you know, just very

17   interesting field and it's, basically, all just what I

18   thought about doing since quite a young age.

19   Q.    Did you talk to Hillel about becoming a police

20   officer?

21   A.    Just how to -- where do I go, how do I apply;

22   but details, he never really said anything to me.  Like,

23   you know, there is -- you know, "I've been to this

24   incident," or, you know -- you know, how to just -- your

25   day-to-day tasks as a cop.  You know, the paperwork and

D. ATTALI

1    how to deal with the colors, no.  That was something I

2    didn't learn until I went to the first precinct.

3         Q.    Hillel was still an officer at the time you

4    applied?

5         A.    Yes, yes.

6         Q.    Did his being a police officer have anything

7    to do with your desire to become a police officer?

8         A.    No.

9         Q.    Do you recall when you went into the academy,

10   what month, year?

11        A.    July 7th, 2008.  I believe it was July 8th,

12   2008.  July 7th or 8th, 2008.

13        Q.    Okay.  I have that you were appointed as a

14   police officer on July 8th, 2008.

15        A.    Yes.

16        Q.    So you're appointed as a police officer, then

17   you go to the academy?

18        A.    Yes.  Three days later, we were at Queens

19   College, I believe, for three days, roughly.  And then

20   you got assigned to the academy.

21        Q.    Do you remember about that time that there was

22   a story in the New York Post about your joining the

23   force?

24        A.    Yes, I do.

25        Q.    Do you recall what it was entitled?

D. ATTALI

1      A.    No, I don't.

2      Q.    Do you recall the article?

3      A.    Vaguely.  Just -- there was a bunch of other

4  Jewish police officers that were there and they took a

5  picture, but I don't know what they were saying.

6           (Whereupon, the following document was marked

7           as Defendant's Exhibit D for identification as of

8           this date by the Reporter.)

9  BY MR. SINGLETON:

10     Q.    I'm showing you what I've marked as

11  Defendant's Exhibit D.  It's a copy of the New York Post

12  article entitled "NYPD Chosen Guns."  Take a look at

13  that.

14           Do you recall seeing this article at or about

15  the time it was published?

16     A.    Yes.

17     Q.    And it quotes you in the article, correct?

18     A.    Misquoted me in the article.

19     Q.    And how did it misquote you?

20     A.    I think that the reporter said that I said, "I

21  think girls actually like it, because how many Jewish

22  cops are there?" I did not say that at all.  And I

23  called the guy up after and let him know that I was

24  pretty upset with that.

25     Q.    I'll just read, for the record, what's

D. ATTALI

1    attributed to you.

2        A.   Yeah.

3        Q.   It says, "Single and 25, David Attali is

4    hoping that being a cop will make him a babe magnet or,

5    at least, help him find a wife.  'I think girls actually

6    like it because how many Jewish cops are there?' he

7    said.  But he worries that the low-starting salary will

8    make it tough keeping kosher.  'A burger at McDonald's

9    cost 2 or 3 bucks, but at a kosher place it's 8 bucks,'

10   he lamented."

11           And is it your testimony that that's

12   completely --

13       A.   Well, definitely the top part that, "I think

14   girls actually like it because how many Jewish cops are

15   there?" definitely is not correct.  Because at that time

16   I was not single.  I wasn't married, but I was in a

17   relationship, and -- yeah.  And I remember being

18   specifically upset about the first part of the quote,

19   that when he wrote, "I think the girls like it because

20   how many Jewish cops are there?"

21       Q.   And the reporter saying you're hoping that

22   being a cop will make you a babe magnet, is not true?

23       A.   No.  I mean, that's his own opinion, but I

24   said nothing about that.

25       Q.   Did you become friendly with any of the other

D. ATTALI

1    officers mentioned in the article?

2        A.    No.

3            (Whereupon, the following document was marked

4        as Defendant's Exhibit E for identification as of

5        this date by the Reporter.)

6    BY MR. SINGLETON:

7        Q.    I'm showing you what I've marked as

8    Defendant's Exhibit E.   It is one sheet of notes signed

9    by Edward Farkas M.D., dated January 9th, 2015.

10            Have you ever seen this?

11       A.    No.

12       Q.    In the body -- in the first paragraph, it

13   says, "At the present time he is seeing a therapist,

14   describing himself as depressed."

15            Would that be Dawn Behar?

16       A.    I believe so.   She is really the only

17   therapist that I've ever seen.

18       Q.    He says, "He is 'paranoid' about running into

19   his old colleagues."   Is that something you told him?

20       A.    Yes.

21       Q.    And then he says, "He describes periods in

22   which he is happy and others in which he is extremely

23   sad."   Did you tell him that?

24       A.    Possibly.

25       Q.    Did you have mood swings at the time?

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

D. ATTALI

1     A.   Yes.

2     Q.   Did you see him on more than one occasion?

3     A.   I don't really remember.  Well, I see at the

4   bottom it says Dr. Edward Farkas.  I just don't recall

5   him at all.

6     Q.   And he said that he would -- he put you on a

7   prescription called Remeron, 30 milligrams.

8          Do you recall if you filled that prescription

9   and took that?

10    A.   I don't remember.

11    Q.   But you said you recall taking --

12    A.   Lorazepam, yes.

13    Q.   And who prescribed that?

14    A.   Dr. Frank.

15    Q.   Goldberg?

16    A.   Goldberg, yes.

17    Q.   And this says, "Follow up to be arranged in

18   one month."  You don't recall seeing him once?

19    A.   No.  I mean, the name is somewhat familiar to

20   me.  I just don't recall.  Where is his office?  I have

21   no idea.

22    Q.   This says -- at the end of the first

23   paragraph, it says, "The product of the Jewish school

24   system, he occasionally goes to synagogue"; is that

25   correct?

D. ATTALI

1      A.   Yes.

2      Q.   I mean, when he says you occasionally go?

3      A.   Yes.

4      Q.   And, I guess, that's something you described

5   to him?

6      A.   I suppose.

7      Q.   What does that mean?

8      A.   Occasionally means about every other weekend,

9   you know, every other Sabbath.  Because, you know, not

10  all the time you're going to walk up Saturday morning

11  or, you know, on time, because sometimes you wake up a

12  little late.  And by the time you get there, it might be

13  over.

14     Q.   And is that true today?

15     A.   Today, definitely, I go more, I believe.

16     Q.   It says you smoke almost a pack of cigarettes

17  daily.  You still smoke a pack of cigarettes daily?

18     A.   No.  More like half now.

19     Q.   Is your mother still alive?

20     A.   Yes.

21     Q.   That's Miriam?

22     A.   Yes.

23     Q.   She is an occupational therapist?

24     A.   Well, she was many years ago.

25     Q.   Did you ever talk to her about this case?

D. ATTALI

1      A.    Not really.   I mean, nothing -- no details,

2  you know, of specific incidents where -- when they were

3  sending me this hateful stuff.   Just -- not really.

4  Just towards the end of my stay at the police department

5  did I say something to her.

6            MR. SINGLETON:   Mark this.

7            (Whereupon, the following document was marked

8        as Defendant's Exhibit F for identification as of

9        this date by the Reporter.)

10  BY MR. SINGLETON:

11      Q.    I'm showing you what's marked as Defendant's

12  Exhibit F.   Is that your signature at the end of the

13  document?

14      A.    Yes.

15      Q.    In Interrogatory No. 1, it asked you to

16  identify each person who has knowledge concerning the

17  subject matter of this action.   And it says, "Plaintiff

18  is aware of the following individuals."   It says

19  Lieutenant Conry.   Who is Lieutenant Conry?

20      A.    He was the IC officer in the World Trade

21  Center Command.

22      Q.    IC officer is the integrity control officer?

23      A.    Yes, it is.

24      Q.    And what did you understand his role to be?

25      A.    I'm not even sure what his job there was

D. ATTALI

1    exactly besides for -- I'm not even sure.

2         Q.   What information do you believe he possesses?

3         A.   I don't know.  He maybe organizes the platoons

4    or does the roll call for the sergeants and the

5    lieutenants, I suppose.

6         Q.   Did you have any interaction with him while

7    you were in the World Trade Center Command?

8         A.   Yes.  Yes, I did.

9         Q.   And describe that for me.

10        A.   Whether it was telephone messages that I had

11   to give him or he was telling me, you know, "Call the

12   sergeant.  Tell him to call me," or, "Who is on what

13   post, Attali?" or who has what car.  Just the basic

14   stuff, I suppose.

15        Q.   Did you have any interaction with him

16   regarding the allegations you've made of discrimination?

17        A.   Yes.

18        Q.   Tell me about that.

19        A.   So after I filed the initial EEO complaint

20   with the stuff that was put on my locker, whether it was

21   the bacon stuff or the Hitler stuff -- I'm pretty sure

22   it was Lieutenant Conry and maybe the inspector that

23   went down to my locker.

24        But after, I came up to him a few days later.

25   I had an incident with one of the officers, Officer

D. ATTALI

1   Sullivan.  At that point, I was at the FOD, which is the

2   forward operating desk, and he came up to me after the

3   roll call and he grabbed me like this and he twisted my

4   shirt and said, "What the fuck, Attali?  Is that you

5   that made the complaint?" and other stuff I don't

6   remember.  And I just looked at him and said, "No."  He

7   said, "Whatever," and walked away.

8         At that point, I told Lieutenant Conry -- I

9   said, "The situation is getting a bit hostile.  Can you

10  please talk to the chief about this?"  He said, "Sure."

11     Q.   Did you talk to him again after that?

12     A.   I don't recall.

13     Q.   You mentioned the forward operating desk?

14     A.   Yes.

15     Q.   What is that?

16     A.   That's the FOD, the forward operating desk.

17  Basically, you're there to, you know, answer any phone

18  calls.  You're responsible for keeping track of all the

19  equipment, for, you know, what sergeant has what Taser

20  or who has what, you know, RMP, the patrol car, as well

21  as -- you know, all various equipment that was used on a

22  daily basis, the detector machine, the first-aid kit.

23  So you have to always make sure whoever takes it, you

24  keep track of who has it.

25     Q.   And how did you keep track?

D. ATTALI

1    A.   You would ask people, you know, "What do you

2  have?"  Or someone would tell you, "Oh, I'm driving

3  Sergeant Santana."  I'll say, "Okay.  What Taser are you

4  taking from him?"  And he would say Taser 1121, and

5  that's what I put on the record.

6    Q.   You mentioned an inspector in your answer.

7  Was that Deputy Inspector Burke or someone else?

8    A.   Yes, it was Deputy Inspector Burke.

9    Q.   You mentioned Officer Sullivan.  In this case,

10  you've made -- you've alleged that five officers made

11  anti-Semitic remarks directed towards you, correct?

12    A.   I believe so.

13    Q.   And that's Officer Delbrocolo, Officer

14  Beneduce, Officer Drummy, Officer Miranda, and Officer

15  Sullivan?

16    A.   Yes.

17    Q.   And in your prior answer there, you said that

18  Officer Sullivan grabbed you.  That's the basis of your

19  retaliation complaint?

20    A.   Can you rephrase that question?

21    Q.   You mentioned in your prior answer there was a

22  point in time that Officer Sullivan grabbed you?

23    A.   Yes.

24    Q.   And you reported that to Lieutenant Conry?

25    A.   No.  I'm pretty sure I told Sergeant Soto from

D. ATTALI

1    EEO -- OEEO.

2        Q.    Okay.  You didn't report that to Lieutenant

3    Conry?

4        A.    No, I don't think so.

5        Q.    And is that what you described as retaliation?

6        A.    Yes.

7        Q.    Any other incidents or retaliation?

8        A.    No, not like that.

9        Q.    Did you feel that the denial of your

10   application for three-quarters benefits was a

11   retaliation?

12       A.    No.

13       Q.    I want you to describe for me your

14   relationship with each of the officers that you allege

15   made anti-Semitic remarks.  So let's start with Officer

16   Delbrocolo.

17       A.    Officer Delbrocolo.  I'm sorry.

18       Q.    You came to the World Trade Center Command in

19   July of 2011?

20       A.    Correct.

21       Q.    When the command was formed?

22       A.    Correct.

23       Q.    And at that time, many other officers came and

24   joined that command, correct?

25       A.    Yes.

D. ATTALI

1    Q.   And of those five officers I mentioned, did

2  they all come at that time?

3    A.   Yes.

4    Q.   And at the time you joined the command, you

5  were on full duty?

6    A.   Yes.

7    Q.   All right.  So describe for me your

8  relationship with Officer Delbrocolo.

9        MR. AVALLONE:  Initially?  In the beginning

10       we're talking about, or what period of time?

11       MR. SINGLETON:  Yeah.

12   Q.   I want to know from the time you came to the

13  command in July of 2011, when you first -- did you know

14  him prior to that?

15   A.   No.

16   Q.   So you made his acquaintance when he came to

17  the World Trade Center Command and you came to the World

18  Trade Center Command?

19   A.   Yes.  Specifically, once we all were scheduled

20  to whatever shift you were.  So we were assigned to the

21  World Trade Center Command, but then we had a training

22  period of -- I don't recall exactly -- maybe a month and

23  a half.  You know, everybody did a day shift.

24       And then once that training period was over,

25  we got to the command.  They said, "Midnight.

D. ATTALI

1  Midnight," you know, who is doing what.  So at that

2  point, yes, I met everybody, more or less.

3      Q.   And the midnight shift is the third platoon?

4      A.   It's the first platoon.

5      Q.   First platoon?

6      A.   First.

7      Q.   And how many squads are there?

8      A.   Three, I believe.

9      Q.   And is the squad and platoon the same thing or

10 are they different things?

11     A.   They're different.  Because you'll have three

12 squads, because you have three different sergeants and

13 they have different rotating days.

14     Q.   Are there three squads in the first platoon?

15     A.   Yes.

16     Q.   And are there three squads in each of the

17 other platoons?

18     A.   I believe so.

19     Q.   Is it your understanding there is a platoon

20 for each tour?

21     A.   Yeah.

22     Q.   And instead of "yeah," try and say "yes."

23     A.   Yes, yes.  Excuse me.

24     Q.   So when you first came to the World Trade

25 Center Command, were there certain officers that you

D. ATTALI

1    immediately gravitated towards and became friendly with?

2        A.    No, not necessarily.   Just, you know,

3    everybody was new and it was just, generally, a good

4    feeling at the time.

5        Q.    Is it fair to say you're a confident and

6    outgoing guy?

7        A.    Yeah, you could say that.

8        Q.    Friendly?

9        A.    Yes.

10       Q.    Is it fair to say that you've been a leader in

11   the course of your life?

12       A.    No.

13       Q.    Would you describe yourself as a follower?

14       A.    No.

15       Q.    How would you describe yourself?

16       A.    Independently -- independent thinking, I

17   suppose.

18       Q.    Okay.   Fair enough.

19            So tell me, how did your relationship -- would

20   you say you had a relationship with Officer Delbrocolo?

21       A.    None whatsoever.   Unless from professional

22   levelizing, "What car you're taking?" you know, "What

23   post do you have?  Are you my meal relief?"  Pretty much

24   that's about it.

25       Q.    You didn't regard him as being a friend?

D. ATTALI

1    A.   Definitely not.

2    Q.   You say "definitely not."  Why definitely not?

3    A.   Because only hate came out of his mouth.  I

4  mean, every other word is:  I want to hurt you or I want

5  to kill you, shove you, you, your family, your people.

6    Q.   Starting in July of 2011?

7    A.   No, because I didn't meet him until, possibly,

8  September of 2011.  Once we got to the midnight shift,

9  and then -- I don't recall him right away being there

10  for some reason.  But when I first met him, you know, it

11  was just, you know, "Hey.  What's up?  How are you?"

12  And then, gradually, he just started, you know, all the

13  bullying and anti-Semitic stuff and he didn't stop

14  talking about it all day.

15    Q.   What was your squad number?

16    A.   I don't recall.  I was in the separate squad.

17  I think it was me and only one other individual were in

18  this squad, because we had Friday night off.  And there

19  was only one other guy and he was on a different shift

20  that we were in the same squad.  Because of our

21  schedule -- we both had the same type of schedule, so we

22  were the only two people in this squad.

23    Q.   And why was that?

24    A.   Because we had a Saturday off.  Or for me,

25  Friday night, which was a midnight shift.  Friday night

D. ATTALI

1   is Saturday.  So I had Thursday night and Friday night

2   off.

3          Q.   Who was the other officer?

4          A.   Officer Green was his name.  I think his name

5   was Officer Green, I guess.

6               MR. AVALLONE:  Don't guess.

7          A.   I don't know.  I don't remember.

8          Q.   Well, let me ask:  You had Friday night off --

9          A.   Yes.

10         Q.   -- because you requested a religious

11   accommodation, correct?

12         A.   Yes.

13         Q.   And you were granted that accommodation?

14         A.   After a little bit of heat about it, yes, I

15   was.

16         Q.   When you say "a little bit of heat," what do

17   you mean?

18         A.   Originally, when we got to the command, I had

19   requested from the lieutenant -- her name was -- I don't

20   remember her name, but after a little while she was

21   transferred out.  I think she went to the FBI or

22   something.  I said, "You have me on day tour.  That's

23   cool.  I like day tour."  It might've been -- I gave her

24   the letter I received from -- maybe it was OEEO for

25   reasonable accommodation.

D. ATTALI

1            And she said, "No.  I'm not going to

2  accommodate you."  And then I had spoken to a sergeant I

3  know from the Shomrim Society, Sergeant Franco.  And

4  then I got a notification that:  Oh, you got the --

5  you're accommodated, but you're doing a midnight.  I

6  said, "Okay.  Thank you."  But she was quite upset when

7  I asked her.

8       Q.   You also sought a religious accommodation so

9  that you could wear a beard, correct?

10      A.   Yes.

11      Q.   And that was rejected?

12      A.   Was it?

13      Q.   Did you wear a beard?

14      A.   Oh, no, no.  I did not.  I did not.  In the

15  end, I didn't follow up with it.

16      Q.   It was not approved and you didn't follow up?

17      A.   It was not approved because I never showed up

18  to do the paperwork or -- I can't remember what it was.

19      Q.   But they asked you to provide supporting

20  documentation?

21      A.   Yes.

22      Q.   And you did not do that?

23      A.   Yes.

24      Q.   Directing your attention back to the exhibit

25  in front of you, the second person on the list is Police

D. ATTALI

1    Officer Xue; is that right?

2         A.    Xue, correct.  Yes.

3         Q.    Do you know his first name?

4         A.    No, I don't remember his first name.

5         Q.    I'm not sure how to pronounce it, but it's

6    Quanyao?

7         A.    Okay.  Possibly.

8         Q.    Q-U-A-N-Y-A-O and the last name is spelled

9    X-U-E.

10             And why is he listed as someone that you

11   believe has knowledge?

12        A.    For example, if a roll call was going to start

13   for the midnight shift, so there'd be pretty much all of

14   us standing around, waiting for the sergeant to come.  A

15   lot of times during those times, when you're waiting for

16   a roll call to happen, whether the sergeant is a few

17   minutes late or everyone is a bit early, there would be

18   comments from -- whether it was Sullivan, Beneduce, or

19   Officer Delbrocolo directed towards me about, you know,

20   just being Jewish and everything along with that.

21             And these people, like Gil or Payne or Xue,

22   everyone was there, you know.  It's not like they're

23   whispering it to me.  They're just standing there, like

24   we're sitting here now, saying, "You're a dirty fucking

25   Jew.  What were you doing this past Saturday?"

D. ATTALI

1      Q.   So describe for me -- you're saying a roll

2   call.  Are you all collectively in a room together?

3      A.   Yes.

4      Q.   Was the sergeant giving some kind of

5   instructions or something?

6      A.   Yeah.  Well, he could come and then he would

7   instruct, you know, what your post is, whoever is doing

8   what, or whatever the issue was for the day, inspecting

9   your gun.

10      Q.   And this is the beginning of the tour?

11      A.   Yes.

12      Q.   And how many people are in this group?

13      A.   I don't recall.  I can't give you a definite

14   number, a specific number.  Because every day it's

15   different, depending on what squad is in, or he could be

16   sick or he could be out on vacation or late or I don't

17   know, but a bunch of cops.

18      Q.   But there is approximately 190 officers in

19   total in the World Trade Center Command split among

20   three tours, correct?

21      A.   Yes.

22      Q.   So, roughly, 65?

23      A.   No, no, no way.  The midnights, 15, I'd say

24   was an average number for a roll call.

25      Q.   And you were on midnight shift most of the

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

D. ATTALI

1   time that you were in the World Trade Center Command,

2   correct?

3        A.   Yes.

4        Q.   Except for during training, initially?

5        A.   Yes.  But once we officially started, yes, I

6   was on midnights from when we officially started to the

7   day I left.

8        Q.   And you said there were about 15 people on

9   that tour?

10       A.   Give or take a few.  I can't give you an exact

11   number.  I never knew that number.

12       Q.   And you mentioned Payne.  That's Christina

13   Payne?

14       A.   Yes.

15       Q.   And Gil?  Do you recall Gil's first name?

16       A.   Yes, Aldo, A-L-D-O.

17       Q.   Aldo Gil.

18            And the third person here is Officer Collazo.

19   That's Alexi Collazo?

20       A.   Yes.

21       Q.   And what knowledge do you believe that Alexi

22   Collazo possesses?

23       A.   That he was present during when I was sitting

24   at the FOD.  I'm sure you guys know he drove Sergeant

25   Porcelli a lot.  He kind of was his unofficial driver.

D. ATTALI

1           So being the sergeant's driver, you don't have

2    to go out to posts immediately.  You know, you get to

3    hang out until the sergeant does whatever the sergeants

4    do after roll call for, you know -- I can't give you an

5    exact amount of time, but they're not rushing out to

6    post.  So him hanging out around a lot by FOD, whether

7    he is sitting and looking at the TV that was on, while

8    Officer Delbrocolo would come by and do specific things

9    to me or say specific things to me.  And I believe, from

10   my recollection, that he was there for a lot of it.

11        Q.   So in your prior answer, you mentioned

12   Officers Xue, Gil, and Payne --

13        A.   Yes.

14        Q.   -- as being at roll call, and you believe they

15   overheard these remarks by Delbrocolo or Sullivan and

16   Beneduce?

17        A.   Yes.

18        Q.   And you believe Collazo overheard him because

19   he was --

20        A.   Definitely.

21        Q.   -- driving the sergeant or would stand near

22   the forward operating desk?

23        A.   Yes.

24        Q.   Well, let's close the loop here.  Does

25   Officers Xue, Gil, and Payne have any other knowledge

D. ATTALI

1    other than they're overhearing remarks in roll call?

2        A.    No.

3        Q.    And does Collazo have any other knowledge

4    other than he's overhearing remarks because he is near

5    the forward operating desk?

6        A.    No.  Besides from being at roll call or at the

7    FOD, no.

8        Q.    And Officer -- is it Mergeche?

9        A.    Mergeche.  That's how he pronounced it, yes.

10       Q.    And his first name is Jorge?

11       A.    Yes, I believe so.

12       Q.    What knowledge do you believe he has?  And for

13   the record, that's M-E-R-G-E-C-H-E.  Jorge, J-O-R-G-E.

14       A.    He would have the same knowledge as being at

15   roll call and overhearing certain remarks as well as --

16   I do believe there are some text messages that were

17   directed against me, with him being part of that group

18   text.  Not that I recall him specifically either sending

19   me something nasty or hateful, but he was part of a

20   group text that was -- that they did send me something

21   that hurt me or that was hateful.

22       Q.    What about Officer Vlad Hamilton?  V-L-A-D.

23   Hamilton, H-A-M-I-L-T-O-N.

24       A.    I would say he overheard some stuff at roll

25   call.

D. ATTALI

1      Q.   So you'd put him in the same class as Xue,

2  Gil, or Payne?

3      A.   Yes.   Whether he was specifically listening to

4  a conversation, I don't know, but he definitely was

5  there at roll call.

6      Q.   Was he on group texts?

7      A.   I don't recall.   I don't know.

8      Q.   We'll come back to him.

9           Patrol Officer Vega?

10     A.   Yes.

11     Q.   What's his first name?

12     A.   Christopher, I believe.

13     Q.   And what knowledge do you believe he

14  possesses?

15     A.   Same thing, at roll call with the other

16  officers while they were telling me things about me

17  being Jewish, how I deserved to die.

18     Q.   And, lastly, Patrol Officer Ed Ramirez?

19     A.   Officer Ramirez would have been at roll call

20  and overheard this, and possibly either -- possibly, was

21  in one of the group texts.   I would have to overlook

22  those texts to see if there was a specific incident, but

23  I believe he was possibly in one of them.

24          MR. GARBER:   It's about 10:35.   Do you want to

25     take a break while you're looking?

D. ATTALI

1          MR. SINGLETON:  Let's take ten minutes.

2          (Whereupon, a short recess was taken from

3      10:35 a.m. to 10:48 a.m.)

4          (Whereupon, the following document was marked

5      as Defendant's Exhibit G for identification as of

6      this date by the Reporter.)

7   BY MR. SINGLETON:

8      Q.   I'll show you what I've marked as Defendant's

9   Exhibit G.  It's a personnel list for the World Trade

10  Center Command, covering the period of July 1st, 2011,

11  through August 30th, 2014.

12          And that covers the entire period you were at

13  the World Trade Center Command, correct?

14     A.   Yes.

15     Q.   Could you look through that list and tell me

16  if there is anyone else that you recall who has

17  knowledge, because the last thing on this

18  Interrogatory 1 that we were looking at, you say, "Plus

19  many other personnel from the midnight tour," correct?

20     A.   Yes.  Do you want me to just find the other

21  people that I thought were here or --

22     Q.   Well, is there anybody else who you think has

23  knowledge?

24     A.   Well, basically, the whole midnight shift.  I

25  mean, everybody was there.  You know, it's at a roll

D. ATTALI

1    call.  I don't know who was in at the time, but whether

2    they were having their own conversation with other

3    officers while this was going on in the roll call room,

4    but pretty much everyone from midnight.

5         Q.   So let me understand this.  So you're saying

6    everybody in that roll call room would've heard these

7    remarks --

8         A.   Yes, whether --

9         Q.   -- if they were paying attention?

10        A.   Yes, if they were paying attention, yes.  If

11   they weren't, you know, having conversation like this or

12   they're talking to me there.

13        Q.   Now, of those people that you say could've

14   overheard these remarks --

15        A.   Yes.

16        Q.   -- are there people that you, in fact, know

17   overheard these remarks because of something they said

18   or some reaction on their part?

19        A.   Yes.  For instance, Collazo.  In my mind,

20   there is no way he did not -- spending -- did not hear

21   any of these remarks from Delbrocolo, seeing how much

22   time he spent, you know, whether in the same room as me,

23   watching TV, or just hanging out by the FOD waiting for

24   the sergeant to get out.

25             Delbrocolo was standing there all day long,

D. ATTALI

1   you know, whether it was throwing money at me, change

2   specifically, or shooting rubber bands at my head,

3   passing gas on me.  Yeah.

4          You know, I was there at disposition [sic] on

5   Thursday, and, obviously, I remember he said "no," but,

6   in my mind, yes, I do recall he was there for many

7   instances.

8       Q.   Officer Collazo, he is Puerto Rican, correct?

9       A.   I believe so, yeah.  He said it on Thursday.

10      Q.   Did you know that?

11      A.   No.

12      Q.   You and he were friendly?

13      A.   I wouldn't say friendly.  Just more like a

14   professional relationship.  I never hung out with these

15   guys after work, you know.  If I didn't work with them,

16   I wouldn't see them, you know.  It was because we were

17   together in a workplace that I would interact with them.

18      Q.   Understood.  But there is a lot of degrees

19   between having a friend and seeing him after work and

20   socializing with him outside of the workplace.

21      A.   Yes.  At work, yes, I was friendly with

22   Collazo.  Yes.  He specifically never made any remarks

23   to me.

24      Q.   And is it fair to say you talked to Collazo,

25   you had a common background in terms of both had

D. ATTALI

1   military experience, correct?

2       A.   Yes.

3       Q.   And you talked about that?

4       A.   Not so much.  Here and there, once in a blue

5   moon.  He'd tell me more about going to Iraq.  I believe

6   it was in Iraq.  His patrols, getting lost on the

7   patrol, and random things from there.  I believe he,

8   possibly, told me he got hit by a truck.  I don't

9   remember.

10      Q.   But you did talk to him on more than ten

11  occasions?

12      A.   Definitely.

13      Q.   More than 20 occasions?

14      A.   Yes.

15      Q.   Is it fair to say that you would talk to him

16  every week?

17      A.   If he was in and driving the sergeant, pretty

18  much I would see him every week.  Just like I said, he

19  would have to hang out, you know, in the base until the

20  sergeant would get out and do his, you know,

21  inspections.

22      Q.   And do you have any reason to believe that he

23  harbored ill will toward you?

24      A.   No.

25      Q.   He said he is a guy who just keeps his head

D. ATTALI

1   down and does his job?  Is that fair?

2       A.   Pretty much.  Yes, I would say so.

3       Q.   Did you know Officer Murray?

4       A.   Murray, yes.

5       Q.   And what's his first name?

6       A.   I don't know.

7       Q.   Christopher?

8       A.   I can't remember what his first name was.

9       Q.   Did you ever talk to him?

10      A.   Yeah.  Just being on the midnight, you see him

11  on roll call or getting something from you.  You say,

12  "Hey, what's up.  How are you?"

13      Q.   He was on that tour?

14      A.   Yes.  But I don't think he started on the

15  midnight tour, initially.  I think he came in a little

16  bit later on, possibly.

17      Q.   Do you recall having a conversation with

18  Officer Murray after you had been turned down for --

19  your application for three-quarter disability had been

20  turned down?

21      A.   No.

22      Q.   Did you see any documents referencing such a

23  conversation?

24      A.   No.

25      Q.   Did you finish going through that list?

D. ATTALI

1      A.   Yes, I did.

2      Q.   And anybody else who --

3      A.   No, sir.  I was just looking for my name.

4      Q.   Do you recognize anybody -- any officers there

5  who were transferred out of the division?

6      A.   While I was there?

7      Q.   Yes.

8      A.   I think there was another -- there is one

9  officer who, I believe, went to aviation.  I can't

10  remember his name.  I think Mergeche went to, possibly,

11  IAB.

12      Q.   Do you know of anybody who got transferred out

13  of the World Trade Center Command while they were on

14  modified or restricted duty?

15      A.   Not that I know of.

16      Q.   How would you describe your relationship with

17  Sergeant Porcelli?

18      A.   The basic, you know, "What's up, Sarge?  How

19  are you?"

20      Q.   Cordial?

21      A.   Yeah.

22      Q.   Friendly?

23      A.   I suppose.

24      Q.   How about Vlad Hamilton?

25      A.   Same, just cordial.  "What's up, Vlad?  How

D. ATTALI

1  are you?"

2      Q.   Well, again, there is lots of degrees.  So of

3  the 15 people on the night tour, on the midnight tour,

4  how many would you say you spoke to on a regular basis?

5          MR. AVALLONE:  Just note my objection.  When

6      you say "speak to," you mean in a business manner

7      or in a casual, friendly manner?

8      A.   I mean, you speak to everybody every night,

9  because you have to deal with them.  You have to give

10  them --

11      Q.   All right.  Apart from keeping track of their

12  radios and cars and where they are, how many of them did

13  you exchange pleasantries with on a regular basis?

14      A.   A lot of people, because -- FOD, you know,

15  where I was at, is -- you know, after roll call,

16  everyone comes there, because you have two different TVs

17  on, you can change a channel, do whatever you want.

18  It's where they hang out.  It's where you can look

19  through notifications or command log is right there.  So

20  it's where a lot of people used to congregate at.  You

21  can go right outside and smoke over there.  So that's

22  where a lot of people congregated.

23      Q.   So is it fair to say you had a

24  cordial-friendly-business relationship with everyone on

25  the midnight tour, or were there certain people that you

D. ATTALI

1   just really never talked to?

2        A.   Definitely, certain people I never talked to

3   unless it was work-related.

4        Q.   And who would those be, do you know?

5        A.   Delbrocolo, Beneduce.  Yeah.

6        Q.   Delbrocolo and Beneduce?

7        A.   Yeah.

8        Q.   You were present for most of the Collazo's

9   deposition, and he was asked by your attorney whether he

10  would find remarks, certain remarks, offensive.  And he

11  said "yes," but he said, "I would say something.   I

12  would call them out.  I would say something."

13            Did you call them out, say something?

14       A.   Who?  Collazo?

15       Q.   Collazo, Delbrocolo, Miranda, Drummy.

16       A.   Yeah.  Well, I told Delbrocolo he was a

17  racist, a Nazi-lover, because he didn't stop talking

18  about Hitler and that whole period and era is just

19  constant from him, all the time.  Yeah.  And I'd tell

20  him, "Enough is enough."

21       Q.   So when did you first say that to him?

22       A.   Specifically, I don't recall.  A date or a

23  time or a location, I don't know.

24       Q.   On more than one occasion?

25       A.   Yeah.

D. ATTALI

1    Q.    On more than five occasions?

2    A.    Couldn't say.

3    Q.    Well, you're saying that with respect to

4    Delbrocolo, he is hurling remarks, anti-Semitic remarks,

5    on you all the time?

6    A.    Yes.

7    Q.    Downright abusive?

8    A.    Yes.

9    Q.    And that on occasion you'd say, "Enough.

10   Stop.  You're a racist," correct?

11   A.    Yes.

12   Q.    Did you ever say, "Look, this is unacceptable.

13   I'm not putting up with this anymore.  Keep it up.  I'm

14   reporting you"?

15   A.    No.

16   Q.    Why not?

17   A.    Because when I'd tell him, you know, "Leave it

18   alone," or "What's your infatuation with Hitler?" it

19   would just egg him on.  He'd get excited and bother me

20   more.

21        So at a certain point, I'd said, "This guy is

22   crazy," you know.  You say, you know, "Can you leave it

23   alone already with Hitler," and other things and

24   whatever he would say, and I don't know.  He liked that,

25   you know.  I don't know what to compare it to.  Like a

D. ATTALI

1   shark smelling blood.  He would get more excited and

2   just annoy me even more and bother me more.

3        Q.   Did you get the sense that he thought you

4   didn't mind?

5        A.   No, not at all.  I think that he liked it when

6   he saw that it bothered me.

7        Q.   Let me understand this.  I take it there are

8   degrees, again, between these five officers that you say

9   made these anti-Semitic remarks, correct?

10       A.   Yes.

11       Q.   Delbrocolo being the worst?

12       A.   I would say so.  For sure.

13       Q.   And who is the least?  Drummy?  Miranda?

14       A.   I couldn't say who is the least.

15       Q.   Would you regard any of the others as flat-out

16   racists?

17       A.   Pretty much all of them.

18            MR. SINGLETON:  Off the record.

19            (Whereupon, an off-the-record discussion was

20       held.)

21   BY MR. SINGLETON:

22       Q.   So at some point -- well, you recorded certain

23   conversations that took place in a locker room and

24   outside the command, correct?

25       A.   Yes.

D. ATTALI

1    Q.    And I want to understand how that came about.

2    Did you say -- you heard a remark and said, "Hold on a

3    second.  I've got to get my phone out," put on a

4    recorder, or did you already have it on?

5    A.    I don't know.  I don't remember.  I don't

6    remember how I did it exactly.

7    Q.    All the recordings that you did provide in

8    this case, these audio recordings, were they made on

9    your cell phone or some other device?

10   A.    My cell phone.

11   Q.    Any other device you used?

12   A.    No.

13   Q.    Were the recordings ever transferred to a

14   computer?

15   A.    Yes, I believe so.

16   Q.    By whom?

17   A.    By my attorneys.

18   Q.    They took it off your phone and put it on a

19   computer?

20   A.    Yes.

21   Q.    There are several audio conversations that

22   were recorded outside the command on the street,

23   correct?

24   A.    I don't know how many were recorded outside or

25   whether it was at the FOD or inside the command, inside

D. ATTALI

1    the actual command but outside the FOD.  Because there
2    is -- so there is two entrances to the command.  There
3    is a side entrance, then there is the main, official
4    entrance by the FOD.  But once you come through, you
5    have to scan to get through the gates.  And then once
6    you get in through the gates, you're in the compound, so
7    to say.  Then you walk up a flight of stairs, and then
8    you scan again, and then you get to the FOD.  So some of
9    the recordings happened on that staircase, right outside
10   the door of the FOD.

11        Q.   So the FOD is on the desk, it's on the second
12   floor, correct?

13        A.   Yes.

14        Q.   And they describe it as a little anteroom?  As
15   you enter, it's a small room?

16        A.   Yes, exactly.

17        Q.   Then, if you keep going in, you have a long
18   rectangular office space where there are administrative
19   people?

20        A.   Yes.

21        Q.   And Deputy Inspector Burke's office is
22   immediately once you go into the administrative area, to
23   the right?

24        A.   Yes, I believe so.  Or it was the bathroom
25   right on your right, and then his.  I believe so.

D. ATTALI

1      Q.    The bathroom and then his office?

2      A.    Yes.

3      Q.    But his office is right --

4      A.    Yeah.  Once you come out of the anteroom, the

5   FOD, and you look, there is lieutenant's desk right in

6   front of you, and then his office is right there.

7            MR. AVALLONE:  To the right?

8            THE WITNESS:  To the right, yes.

9      Q.    And Deputy Inspector Burke, was he there

10  throughout the entire time you were in the World Trade

11  Center Command?

12     A.    No.  I believe there was another inspector at

13  the beginning, Inspector McKee.

14     Q.    And how long was, to your recollection, Deputy

15  Inspector Burke the commanding officer of the WTC

16  command?

17     A.    From what I recall, possibly, maybe, a year

18  before I left.  I don't remember the exact dates.

19     Q.    Fair to say that you were on

20  modified/restricted duty the entire time he was there?

21     A.    Yeah.

22     Q.    And how would you describe your relationship,

23  if any, with Deputy Inspector Burke?

24     A.    There was none.

25     Q.    Cordial, friendly?

D. ATTALI

1      A.   I practically saw him maybe four times in my

2   whole life.  I don't know what his hours were, but once

3   in a blue moon he'd come, sign in early, and walk past

4   me, "Hello.  Good Morning," and go into his office and

5   that's it.

6      Q.   Did he strike you as standoffish or someone

7   who was accessible?

8      A.   He didn't strike me as anything.  I just,

9   literally, saw him four times in my life, I think.  I,

10  literally, had no conversation with him at all to

11  evaluate his personality, I suppose.

12     Q.   Is it correct that every time you came in at

13  the beginning of your tour, he was still there?

14     A.   No.

15     Q.   No?

16     A.   No.

17     Q.   You know that he was gone many times?

18     A.   Yeah, and the office door was closed.

19     Q.   Did you ever attempt to go see him for any

20  reason?

21     A.   No.  Until I did the -- well, I didn't see him

22  personally, but I gave him -- actually, I don't remember

23  who I gave the transfer form to.

24     Q.   You said you used e-mail to send the transfer

25  request to Deputy Inspector Burke, correct?

D. ATTALI

1      A.   I don't recall, but I know I did a UF-49 or

2   50.  I don't know who I gave it to, to give to him,

3   though.

4      Q.   What's the difference between a UF-49 and a

5   57?

6      A.   I don't know.  I don't remember anymore.  It's

7   a lot of UFs.

8      Q.   Did you maintain a memo book while you were a

9   police officer?

10      A.   Yes.

11      Q.   And you still have possession of that memo

12   book, correct?

13      A.   I believe so.

14           MR. SINGLETON:   I ask for production of that

15      memo book.

16      Q.   And does that memo book cover the entire

17   period that you were in the World Trade Center Command?

18      A.   Yes.

19      Q.   And in that memo book you would record -- what

20   would you record?

21      A.   Basically, present for duty, you know,

22   whatever time, 11:15, assignment FOD, what time you took

23   meal, got off meal.  That's about it.

24      Q.   And tell me about the memo book.  A memo book

25   is something that you retain in your possession,

D. ATTALI

1    correct?

2         A.   Yes.

3         Q.   Nobody asked you for it, correct?

4         A.   No.

5         Q.   When you leave the force, you're expected to

6    retain it, correct?

7         A.   I believe so.

8         Q.   That's your understanding, from what you're

9    trained in?

10        A.   Yes.

11        Q.   And you record events concerning your

12   professional -- your job as a police officer?

13        A.   Yes.

14        Q.   Did you record anything in that memo book

15   about the disparaging remarks that you claim were hurled

16   at you on a daily basis?

17        A.   I don't know.

18        Q.   Do you contend that the remarks were hurled at

19   you on a daily basis?

20        A.   Yes.

21        Q.   Throughout the time you were at the World

22   Trade Center Command?

23        A.   Yes.

24        Q.   From the minute Delbrocolo walked in?

25        A.   No.  I would say when I first met him, you

D. ATTALI

1    know, you just meet somebody.  So, you know, maybe he

2    didn't know I was Jewish at the time.  But, you know,

3    you just meet him, and then it just grew from there.

4         Q.   Delbrocolo was the PBA delegate for the World

5    Trade Center Command, correct?

6         A.   Yes.

7         Q.   He was one of how many?

8         A.   Two.

9         Q.   Who was the other one?

10        A.   Beneduce.  Officer Beneduce.

11        Q.   So two of the people that you accuse of making

12   disparaging remarks are the PBA delegates?

13        A.   Yes.

14        Q.   Did you ever seek their counselor advice on

15   any union-related matters?

16        A.   No.

17        Q.   Did you ever talk to them about your

18   application for disability retirement?

19        A.   Yes.

20        Q.   Who did you talk to about that?

21        A.   Officer Beneduce.

22        Q.   On more than one occasion?

23        A.   Possibly.  I don't know.

24        Q.   Well, what do you recall about your

25   conversation?

D. ATTALI

1    A.   I recall saying that the -- the medical

2   district doctor that I was seeing put me in for the

3   three-quarters.  And what happens -- because I had no

4   idea.  And that's really about it.  He didn't really

5   give me any info on what to do.  I thought a delegate

6   goes with you or something, but I don't know.  He didn't

7   really help me at all.

8    Q.   Let me ask you:  Your brother went out on

9   three-quarter disability, correct?

10    A.   Yes.

11    Q.   And it took him -- he had a line-of-duty

12   injury in his first year on the job, correct?

13    A.   I don't know if it was his first year.  I

14   never went into detail with him about it.

15    Q.   All right.  But are you telling me you never

16   had a conversation with your brother, who had gone

17   through the exact same process, about your application

18   for disability?

19        MR. AVALLONE:  Just note my objection.

20    A.   Nope.

21        MR. AVALLONE:  You said "the exact same

22        process."  I don't think we established what the

23        process was to know if it was exact or not.

24    A.   Oh, no.  I never went into detail with him

25   about what happens, you know, where do you go, this and

D. ATTALI

1    that, because from what he told me, he had a

2    different -- he just got a letter or a call, maybe, from

3    sergeant saying, "You've got three-quarters.  Don't come

4    in."

5         Q.   Well, did you get the impression from whatever

6    conversations you had with your brother that the process

7    for you was different?

8         A.   No, because -- I don't know.  I didn't really

9    talk to him about this.  I just knew that he had a metal

10   pole or whatever it was infused in his arm and he got

11   three-quarters.  That's about it.  But I never got

12   details from him, do you put paperwork in, like, I don't

13   know.  Nothing.

14        Q.   Let's go back to Exhibit F.  We're done with

15   that one.

16             Interrogatory No. 2, it says, "Identify all

17   persons who had given you warnings, cautions, criticism,

18   reprimand, adverse evaluations, or adverse or critical

19   comments or suggestions in the New York City Police

20   Department, whether written or oral."

21             And your answer is, "Plaintiff has never been

22   disciplined by any supervisor while at WTCC"; is that

23   correct?

24        A.   I'm sorry.  I really don't understand the

25   question.

D. ATTALI

1    Q.   Well, you could get -- you ever heard of --

2  you have inspections, correct?  Dress inspections?

3    A.   Yes.  Yes.

4    Q.   People see if you're wearing a uniform?  Did

5  you ever get reprimanded for not having proper attire?

6    A.   No.

7    Q.   Ever get reprimanded for not shaving?

8    A.   Yeah.

9    Q.   On more than one occasion?

10   A.   I don't know.  I remember getting one, I

11 think, from -- I think it was Sergeant Porcelli,

12 something like that.

13   Q.   And you didn't think that was called for by

14 this interrogatory?

15   A.   I suppose not.  I'm not sure I understood the

16 question.

17   Q.   Interrogatory No. 3, you identified Sergeant

18 Soto at OEEO as the person to whom you complained, both

19 orally and in writing, regarding your complaints of

20 discrimination.  And the interrogatory calls for all

21 persons at the NYPD.

22        Am I correct that you only spoke to Sergeant

23 Soto?

24   A.   Well, I spoke to him -- yeah, I went down

25 there and I made the complaint with him.

D. ATTALI

1     Q.  But you're saying that, "I never complained to

2  anybody else"?

3     A.  No, not really.

4       MR. AVALLONE:  Are we talking about in

5     official --

6       MR. SINGLETON:  No.  The question is the

7     question.  So if you got an objection, register

8     your objection.

9       MR. AVALLONE:  No.  I just want to know other

10    than what he's already testified to.

11      MR. SINGLETON:  I don't want any testimony.

12      MR. AVALLONE:  We're not giving testimony.

13    I'm just saying:  Are you talking about in regards

14    to a supervisor?

15      MR. SINGLETON:  I think it is improper what

16    you're doing.  Okay?  And I'll ask you not to do

17    it.  If you want to follow up at a later point, you

18    follow up.

19      MR. AVALLONE:  Okay.  I'll just advise my

20    client --

21      MR. SINGLETON:  I don't think --

22      MR. AVALLONE:  -- if you don't understand the

23    question, make sure you advise counsel.  Okay?  I

24    don't want you guessing.

25      THE WITNESS:  Okay.

D. ATTALI

1        MR. SINGLETON:  And I'll tell you, I'm here to

2    conduct my examination.  And if you do that again,

3    it won't be long before we're on the phone with the

4    Magistrate.

5        MR. AVALLONE:  Do what?

6        MR. SINGLETON:  You're not allowed to make

7    comments and you know as well as I do --

8        MR. BELLISTRI:  Was that a comment or a

9    question?

10        MR. SINGLETON:  He had no trouble with the

11    question.  I've explained the rules.

12        MR. BELLISTRI:  It was a vague question.

13        MR. SINGLETON:  If he doesn't understand, then

14    you object.  Objection to form, period.

15        MR. BELLISTRI:  Fine.

16        MR. SINGLETON:  Period.

17        MR. BELLISTRI:  Fine.  You made your point.

18        MR. SINGLETON:  Thank you.

19    BY MR. SINGLETON:

20        Q.   In Interrogatory No. 5, you're asked,

21    "Identify the coworker described in Paragraph 31 of your

22    complaint in this action" --

23        MR. GARBER:  Objection for one second.  Is

24    there still a question about the 3 or we're done

25    with 3?