D. ATTALI

1        MR. SINGLETON:  No.  We're done.

2        MR. BELLISTRI:  Is that okay that he asked the

3    question?  Is that all right?  That's permissible?

4        MR. SINGLETON:  He was not commenting on the

5    content of the witness' testimony.

6        MR. BELLISTRI:  Okay.

7        MR. SINGLETON:  And there is a difference, and

8    you understand that --

9        MR. BELLISTRI:  It wasn't a comment.  It was a

10    question, sir.

11   BY MR. SINGLETON:

12        Q.   Who is Michael Frigedis?

13        A.   I believe it's pronounced Frigedis.  He was an

14   officer that I worked with at the 67th Precinct.

15        Q.   And did he make any anti-Semitic comments or

16   remarks?

17        A.   Yes.  He used to use my ring tone, when I

18   would call his phone, as Hitler giving a speech.  So if

19   I'd call him, his ring tone would go off, and Hitler

20   would be screaming in German.

21        Q.   Did you have his cell phone number?

22        A.   Now, no, because I haven't seen him since.

23        Q.   No.  At the time when you were in the 67th.

24        A.   Yeah.  Yeah.

25        Q.   And did you work with him?  Did you have a

D. ATTALI

1    tour with him?

2        A.    Yes.  Well, again, I was on my own tour

3    because of the accommodations, but the squads rotate.

4    You, eventually, work with everybody.  They would have a

5    different schedule than me, but, eventually, it rotates

6    the days that they work.

7        Q.    Well, in the 67, how many officers did you

8    work with, have a working relationship with?

9        A.    I have no idea.  I can't give you a number.

10       Q.    More than ten?

11       A.    I just don't recall back then.

12       Q.    Did you have all of their cell phone numbers?

13       A.    I don't know.

14       Q.    Did he give you his cell phone number for --

15   is it your testimony that he gave you his cell phone

16   number so that you would call him just to get -- just to

17   listen to an anti-Semitic remark?

18            MR. AVALLONE:  Note my objection.

19       A.    No.  I would call him to, you know, whatever

20   had to do with work, you know, "Got a color.  Come

21   here," or, "You're going to that job," or whatever it

22   was.

23       Q.    You say he had an anti-Semitic ring tone on

24   his phone, correct?

25       A.    Yes.

D. ATTALI

1        Q.    And do you think he had that -- put it on his

2    cell phone for you, or he was just a racist?

3        A.    Oh, he put it specifically for my number,

4    because you could call him and it wouldn't go off, the

5    Hitler speech.  But if I'd call, it would go off.

6        Q.    How do you know it wouldn't go off if someone

7    else called?

8        A.    Because I used to stand there and see him, you

9    know, answer the phone, and it was just the regular --

10   well, I won't say regular ring, but not a voiceover of

11   Hitler, which I assume was Hitler.

12       Q.    You mean if you called him -- you were present

13   when you called him and heard his phone ringing and it

14   would answer with some kind of Hitler ring tone?

15       A.    Yeah, I believe so.

16       Q.    You believe so?

17       A.    Yeah.  Yeah.

18       Q.    Did you say anything to him, call him out?

19       A.    I don't remember.

20       Q.    Make any complaint to anyone?

21       A.    No, I do not think so.

22       Q.    You got a commendation when you were in the

23   67, correct?

24       A.    For what?  The Saturday thing?

25       Q.    What's the Saturday thing?

D. ATTALI

1      A.    To get off, you know, Friday night?

2            MR. AVALLONE:  Did you say commendation or

3      accommodation?

4            MR. SINGLETON:  Commendation.

5      Q.    Do you remember getting a meritorious police

6      duty recognition while you were in the 67?

7      A.    Yes.

8      Q.    And what was that for?

9      A.    I got two types of -- I believe I got two

10     types of awards.  What they were specifically called, I

11     don't remember.  Maybe that is the name of it.  What I

12     believe you're referring to is a fire rescue.

13     Q.    Can you tell me a little bit more?

14     A.    Of the incident itself?

15     Q.    Yeah.

16     A.    I don't remember the building or the address

17     exactly, but there was -- there was a fire in the

18     building or should I say it was smoking like crazy.

19     Didn't see the flames.  And the entrance level of the

20     building -- so it would be the first floor -- there was

21     a day care that I don't remember what side of the

22     building it was on.

23           So at that point, we notified FD and we were

24     knocking on doors to get residents out.  At that point,

25     it was smoking very heavily.  So at a certain point -- I

D. ATTALI

1   don't remember if it was a second or a third floor -- I

2   had knocked on a door because I thought I heard a girl.

3   And a young girl opened up.  She was living with her

4   grandfather.

5           And at that point, when I said, "Hurry up.

6   Get out of the building," by the time I turned around to

7   get out of the apartment, the hallways were pitch black.

8   You could literate not breathe.  You could not see your

9   finger and your face.  And then we went to -- I don't

10  remember which -- one of their bedrooms.  I'm pretty

11  sure I smashed the window, and we got out of the fire

12  escape as the apartment was filling up with the black

13  smoke.  And then at that point, once they got down, I

14  believe I escorted them to an ambulance, and that was

15  the last I ever saw of them.

16      Q.   Did anyone else in the 67 discriminate against

17  you?

18      A.   No.

19      Q.   Anyone else at 70 discriminate against you?

20      A.   No.

21      Q.   Now, in response to Interrogatory No. 6, it

22  says, "Identify all persons who discriminated against

23  you."  And your answer is, "All defendants and

24  P.O. Frigedis"?

25      A.   Yes.

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

D. ATTALI

1     Q.    You don't mean all defendants; you just mean

2  all the police officer defendants, correct?

3     A.    The police officers from the World Trade

4  Center Command, yes.

5     Q.    Well, you were only at three commands,

6  correct?

7     A.    Yeah.

8     Q.    You were at 67, 70 --

9     A.    Yeah.

10     Q.    So you mean only the police officer

11  defendants, correct?

12     A.    Yes, the ones that we have listed, that we're

13  discussing today, yes.

14     Q.    Right.  But you've also sued Deputy Inspector

15  Burke, correct?

16     A.    Okay.

17     Q.    You don't mean Deputy Inspector Burke, do you?

18     A.    I'm sorry.  Say again.

19     Q.    You don't mean that Deputy Inspector Burke

20  discriminated against you, do you?

21     A.    No.  He's never made any remarks to me, no.

22     Q.    When you say "all defendants," you don't mean

23  Lieutenant Chang, do you?

24     A.    Well, Lieutenant Chang, you know, was present

25  during some of the stuff that they were saying to me,

D. ATTALI

1  but never participated, as in added on a comment.

2      Q.   Never made a comment?

3      A.   No.  Never made a comment to me.

4      Q.   You just believe he overheard comments?

5      A.   Oh, yeah.  Yes.

6      Q.   As you believe Christina Payne and Mergeche

7  and --

8      A.   Yes.

9      Q.   -- all the other officers on the first platoon

10 overheard remarks?

11     A.   Yes.

12     Q.   And I'm correct that your answer would be the

13 same for Sergeant Porcelli?

14     A.   Yes.

15     Q.   And for Sergeant Santana?

16     A.   Yes.

17     Q.   Meaning that those supervisory officers never

18 personally made any discriminatory remarks toward you?

19     A.   No.  They never have, but they were present

20 for many.

21     Q.   And is it your testimony that Deputy Inspector

22 Burke was present for many or any?

23     A.   No.

24     Q.   He wasn't present for any?

25     A.   He was not present for any.

D. ATTALI

1    Q.    With respect to the recordings that you made,

2    did you only use one phone to do it or did you have --

3    did they carry over a period of time such that you had

4    different phones?

5    A.    Excuse me.  The recordings, I only made with

6    one phone.

7    Q.    And so we were talking about the layout --

8    A.    Yes.

9    Q.    -- of the exterior of the World Trade Center

10   Command.  You come through a security gate, and then you

11   can either go up the stairs and enter the command where

12   the forward operating desk is, correct?

13   A.    Yes.

14   Q.    Or you can enter on the ground level and go

15   into the locker room?

16   A.    Yes.  Under the stairway that goes up to FOD,

17   there was another entrance straight to the locker room,

18   but that door, you can only come out of.

19   Q.    You couldn't enter that way?

20   A.    No.  Not unless it was already open, then you

21   couldn't get in there.  You would have to just come out.

22   Unless someone left it open, then you could get in.

23   Q.    In your experience, could you walk up and tap

24   on the door and see if someone would open it for you?

25   A.    I suppose.

D. ATTALI

1      Q.    Did you ever do that?

2      A.    Possibly.  I don't recall.

3      Q.    But that door goes into the large men's locker

4   room where your locker was located?

5      A.    Yes.

6      Q.    Now, you say that people -- unknown people

7   posted anti-Semitic material on your locker, correct?

8      A.    Yes.

9      Q.    When did that first happen, to your

10  recollection?

11     A.    A specific date, I don't know.  Like, the

12  first time I saw it, did I know what date it was?  No, I

13  don't know.

14     Q.    Well, you started in July of 2011, and you

15  think Delbrocolo came in September of 2011?

16     A.    Yes.

17     Q.    Did it start almost immediately after he

18  joined the command?

19     A.    I don't remember.

20     Q.    Did it happen before he joined the command?

21     A.    Well, I think he joined the command at the

22  same time as everyone else.  I just...

23     Q.    Oh, you just didn't know him?

24     A.    I just didn't know him until we was put on the

25  midnights together.

D. ATTALI

1    Q.   Because you were going through training?

2    A.   Yes.  So everybody, you know, was just put in

3    one room.

4    Q.   Did you get any training outside of New York?

5    A.   No.

6    Q.   I mean, did you ever go someplace for

7    additional training?

8    A.   No.

9    Q.   So your attorney has produced three recordings

10   of conversations that are described as having occurred

11   outside of the command.

12   A.   Okay.

13   Q.   Do you know who put those descriptions on the

14   recordings?  Did you put the descriptions?

15   A.   I don't know, because I don't know which

16   recordings we're talking about.

17   Q.   Do you recall making the recordings, whether

18   it was on the stairwell or --

19   A.   The stairway one, yeah.

20   Q.   You do recall making that one?

21   A.   Yeah.  That one, I remember.

22   Q.   Tell me about that one.

23   A.   That one, I was outside -- right outside of

24   the FOD having a cigarette, and there was Sergeant

25   Santana, Sergeant Porcelli, Delbrocolo, and I don't

D. ATTALI

1    remember who else was there.

2        Q.    Was this beginning of tour, end of tour?

3        A.    I don't remember.

4              And I just remember Delbrocolo -- sergeants

5    were having a conversation, and he just said something

6    about going back to the 30s to shake Hitler's hand.

7        Q.    So you're saying the sergeants were talking

8    between themselves?

9        A.    Yeah.

10        Q.    And then one of the officers said something?

11        A.    Mm-hmm.  Yes.  When you're standing on the

12    stairway, it was the size of this, you know, square of

13    the table.  They're all standing right there on the top

14    platform.

15              MR. GARBER:  Four by four, approximately?

16        Five by four?

17              THE WITNESS:  Four by four.

18    BY MR. SINGLETON:

19        Q.    So what did you do?  Where was your phone?

20    Was it in your pocket?  Was it in your hand?

21        A.    I don't remember where exactly my phone was.

22        Q.    Well, I'm just trying to understand how it

23    came about that you were able to record this

24    conversation on your phone.  Did you say, "Wow, there is

25    a comment.  Let me get my phone out," or what?  How did

D. ATTALI

1    it happen?

2         A.    I just don't remember.  I don't remember if it

3    was in my pocket or my hand.  I just don't remember.

4         Q.    And when in relation to your filing a

5    complaint with the OEEO of the police department did you

6    record this conversation?

7         A.    Well, I made the complaint in May.

8         Q.    Of 2014?

9         A.    May of 2014.  When I made the recording, I

10   don't remember the date.

11        Q.    Why did you make this recording?

12        A.    Why I made that specific recording?

13        Q.    Yes.

14        A.    I don't recall what was going through my mind

15   at the time.

16        Q.    Did you play it for your wife?

17        A.    No.

18        Q.    Did you play it for anybody, besides your

19   attorneys?

20        A.    No.

21        Q.    Was it accidental that you recorded it or was

22   it intentional?

23        A.    I don't recall.

24        Q.    Did you always know you had that recording?

25        A.    Well, once I recorded it, then you know you

D. ATTALI

1    have it.

2        Q.   I understand.  So it's on your phone now.  You

3    have a recording on your phone.  And you were aware it

4    was on your phone?  That's what I'm asking.

5        A.   Yes.

6        Q.   You didn't forget it?  You didn't say, "Oh,

7    my, I forgot about that."  That didn't happen?

8        A.   No.  I knew it was on my phone.

9        Q.   Now, you had a line-of-duty injury when you

10   were at the 70, correct?

11       A.   Possibly.  I don't know.  I just don't

12   remember.

13       Q.   Do you recall falling on a stairwell, tripping

14   over some garbage and going to the hospital with a

15   sprained knee?

16       A.   Oh, yes, yes, yes.  Yeah.

17       Q.   Tell me what you can recall about that.

18       A.   I think they fired or the janitor just -- I

19   don't know what happened.  They were MIA.  So the locker

20   room is on the third floor.  And at that point, there

21   was no one there to clean up for quite some time, and

22   the garbage was piled very high.  And I was going down

23   to roll call, and I don't know if it was a black garbage

24   bag I stepped on or something.  There was a whole bunch

25   of garbage.  And I just slipped and busted myself.

D. ATTALI

1   That's all I remember.

2        Q.   And you went to the hospital?

3        A.   Yeah.  I remember telling the sergeant what

4   happened.  I remember he was not happy.

5        Q.   You filed a complaint report?

6        A.   I don't remember.  Well, I guess I must have

7   done some type of paperwork if I went to the hospital on

8   tour; but what exactly, I don't remember.

9        Q.   Well, you subsequently retained attorneys.  Do

10  you remember that?

11       A.   Yes.

12       Q.   You filed a Notice of Claim against the City?

13       A.   Yeah.

14       Q.   Do you remember how much you recovered?

15       A.   No.

16       Q.   $5,000 ring a bell?

17       A.   All right.

18       Q.   That's not all right with me.

19       A.   Well, if you say so.  I don't remember the

20  amount.

21            (Whereupon, the following document was marked

22       as Defendant's Exhibit H and I for identification

23       as of this date by the Reporter.)

24  BY MR. SINGLETON:

25       Q.   Let me show you what I've marked as

D. ATTALI

1    Defendant's Exhibit H.  Do you recognize the document?

2         A.   No.

3         Q.   Look on the second page.  Is that your

4    signature at the top?

5         A.   Yes.

6         Q.   It says it's signed by you in Garden City on

7    March 10th?

8         A.   Yes.

9         Q.   And it refers to a law firm at the top.  It

10   says "Decatur, Cohen, DiPrisco"?

11             MR. AVALLONE:  Decolator.

12        A.   Yes.

13        Q.   And do you recall those attorneys representing

14   you?

15        A.   Yes.

16        Q.   And how did you come to retain those

17   attorneys?

18        A.   These attorneys, they had -- from what I

19   recall, in the 67 and 70 Precinct, in all the locker

20   rooms, you just see their fliers everywhere, like all

21   over the precinct.  It's just there.

22        Q.   And that's how you found them?

23        A.   Yes.

24        Q.   And I'll show you what I've marked as

25   Defendant's Exhibit I, and is that a document you

D. ATTALI

1    signed?

2         A.   Yes, it is.

3         Q.   And that's a General Release in connection

4    with the slip and fall -- with respect to the incident

5    we're talking about now, correct?

6         A.   Yes, sir.

7         Q.   And that indicates that you received $5,000 in

8    settlement of the claim?

9         A.   Yes.

10             MR. AVALLONE:   Just note my objection to

11        "received."

12             Off the record.

13             (Whereupon, an off-the-record discussion was

14        held.)

15   BY MR. SINGLETON:

16        Q.   Was $5,000 paid to you?

17        A.   Yes.

18        Q.   And your attorneys took some fees out of that?

19        A.   I don't recall.

20             MR. SINGLETON:   Which, I guess, is your point.

21        Q.   When all of this was going on, the disparaging

22   remarks, when, for example, Frigedis made -- did

23   Frigedis do anything other than have a ring tone?

24        A.   Not that I recall.

25        Q.   And when this stuff happened in the World

D. ATTALI

1   Trade Center Command, which you complained about, did

2   you go back to the Decolator law firm?

3       A.   I don't remember.

4       Q.   Did you consult any other attorney, besides

5   your present counsel?

6       A.   I don't think so.

7       Q.   And when for the first time did you consult

8   with your present counsel?

9       A.   I don't know.  I don't know the exact date.

10      Q.   Has some event triggered your deciding, "I've

11  had enough.  I'm going to see them"?

12      A.   I just don't recall.

13      Q.   Did you know them of Mr. Avallone or

14  Mr. Bellistri before you first went to see them?

15      A.   No, no.

16      Q.   And did you first go to see them before you

17  went to the OEEO?

18      A.   I don't remember.

19      Q.   Were you getting counseling from Officer

20  Beneduce with regard to your application for disability

21  retirement?

22      A.   Initially, I asked him about details and

23  stuff, but it proved to be useless, and I realized in

24  the future why.  Because he just did not like me.  And I

25  believe for the fact, solely alone that I was Jewish, he

D. ATTALI

1    was completely useless as my delegate.

2        Q.    Did you ever say that to him?

3        A.    Possibly.  I don't know.  Well, why would I go

4    to him for anything when he hates my guts or me and my

5    people, religion?  If that's everything that comes out

6    of your mouth, why would I need anything from you?

7        Q.    Let me ask you:  When you first decided to go

8    to the OEEO --

9        A.    Yes.

10       Q.    -- and you spoke to Sergeant Soto, correct?

11       A.    Yes.

12       Q.    Did you speak to anyone other than Sergeant

13   Soto at OEEO?

14       A.    Yes.  There was a female officer there with

15   Sergeant Soto and me in the conference room.  I don't

16   know if she was a sergeant or a detective or a police

17   officer or her name.  I don't remember, because it was,

18   from what I recall, pretty much Sergeant Soto asking me

19   the questions or the one speaking with me.

20       Q.    And was Sergeant Soto responsive to your

21   concerns?

22       A.    I didn't feel like he really cared.

23       Q.    And why do you say that?

24       A.    Because at the time, I wasn't looking to make

25   the situation I was in what it became or what it is now,

D. ATTALI

1   and he kept on asking me for specifics:  The exact time,

2   the exact date, the exact location, the exact person.

3            For instance, when I said, "An officer would

4   pass by me and intentionally would come up and fart on

5   me.  Comments:  You should be used to this Zyklon B" --

6   I think he said Zyklon B.  Or, "You're used to the gas,

7   aren't you?"  When Officer Delbrocolo would walk past my

8   locker and throw change at me, which he did many times.

9   "Can you smell a Jew?  Can you smell it?"

10           He wanted specific dates, times, locations,

11  and I didn't have that, and he didn't seem willing to go

12  ahead on that, because I did not know what date it

13  happened on.  Was it Monday?  I don't remember.  It was

14  a month ago.  I don't remember the date.  The only thing

15  he seemed to pick up on was all the stuff that was put

16  in my locker.

17      Q.   Did he say, "Do you have any evidence of these

18  remarks, anything to substantiate the remarks"?

19      A.   I don't know.  I don't remember what we pretty

20  much talked about.  I just remember telling him --

21      Q.   Well, you say he was asking for specifics.

22      A.   Yeah.

23      Q.   Did he say like, "Did you write it down?  Do

24  you have any" --

25      A.   I don't remember that question.  I don't know.

D. ATTALI

1    I do not know.

2         Q.    Did he ask you if you recorded anything?

3         A.    I don't know if he did or didn't.  I don't

4    remember.

5         Q.    Did you remember that you had recordings on

6    your phone?

7         A.    Yeah, I believe I did.

8         Q.    You did remember?

9         A.    Well, I think I knew I always had them.

10        Q.    And you knew you had the text messages on your

11   phone?

12        A.    Yes.

13        Q.    And did you provide them, those text messages

14   and those recordings, to Sergeant Soto?

15        A.    No, I did not.

16        Q.    And why not?

17        A.    I didn't want to give him that stuff, because

18   at that point all I wanted to be was left alone, just to

19   get away from them.  And -- like, the initial thing that

20   I put on the transfer paper was I didn't care where

21   they'd send me.  Put me anywhere.  Doesn't matter.

22            I liked the World Trade Center Command.  If

23   you ask any cop, it is a great gig.  It's amazing.

24   You're not hounding numbers, so to say.  It's just a

25   plus job in the police department.  At that point, I

D. ATTALI

1    just needed to get away from them.  I couldn't handle it

2    inside of my head, seeing them every day.

3        Q.    When you say "need to get away from them,"

4    you're referring to the five officers you've identified

5    as making anti-Semitic remarks, correct?

6        A.    Yes.

7        Q.    And am I correct that what you wanted then is

8    them gone, not you?  You wanted to be left alone until

9    they were taken -- this cancer was rooted out of the

10   World Trade Center Command, correct?

11            MR. AVALLONE:  Just note my objection.

12       A.    Well, it didn't matter to me whether it was me

13   removed from the World Trade Center or them, just not to

14   deal with them anymore.

15       Q.    Well, from all the training you had in the

16   academy --

17       A.    Yes.

18       Q.    -- and the booklets you got and the patrol

19   guide, was it your understanding that the NYPD had a

20   procedure in place to deal with these issues, that if

21   you made a complaint, they would investigate and they

22   would take action?

23       A.    No.  I did not know how they would proceed

24   with this investigation.

25       Q.    But you understood there was an OEEO office?

D. ATTALI

1      A.    Yes.

2      Q.    And you understood that they handled

3   complaints of this kind?

4      A.    Yes.

5      Q.    And that's why you went to see Sergeant Soto?

6      A.    Yes.

7      Q.    And you expected him to take corrective

8   action, correct?

9      A.    Yes.

10      Q.    And you didn't give it time to play out, did

11   you?

12      A.    Well, nothing played out.  Nothing happened.

13   It just made the situation even worse.

14      Q.    You lived with this for two years you say,

15   correct?

16      A.    Yes.

17      Q.    And you gave it two months before you retired,

18   correct?

19      A.    Yes.

20      Q.    Before the investigation had concluded?

21      A.    I didn't know what was going on with the

22   investigation at that point.  I didn't know if they were

23   finished or starting.  It's not like they keep you in

24   the loop of what's going on.

25      Q.    You spoke to Sergeant Soto, correct --

D. ATTALI

1       A.   Yes.

2       Q.   -- after the investigation?

3       A.   Yes.

4       Q.   You had his phone number, correct?

5       A.   Yes.

6       Q.   You could call him and ask him, correct?

7       A.   I did call him at one point saying, "The

8    situation is getting very" -- after I made the initial

9    complaint, I said, "The situation is getting very bad

10   here."

11      Q.   Did you call him and tell him before you put

12   in your papers for a vested retirement?  Did you call

13   him and tell him, "I can't take it anymore.  I'm

14   leaving"?

15      A.   No.  I just told him -- well, I don't recall

16   exactly word for word, but I remember calling him and

17   saying, "You've got to help me out.  The situation here

18   is very bad."  It's gotten even worse after I made the

19   complaint.

20      Q.   And what did he say? "No, can't do"?

21      A.   It's not like in his -- well, I wouldn't quote

22   him, because I don't recall the exact words, but nothing

23   came out of it.

24      Q.   Who was Police Officer Smertuk, S-M-E-R-T-U-K?

25      A.   Officer Smertuk worked in the World Trade

D. ATTALI

1    Center Command.  Yeah.

2              Well, you want to know about him or --

3        Q.   Yeah.  What did --

4        A.   I'm not sure what he did there, but I just

5    remember he was the one I went to, to figure out what

6    paper do I need to do the transfer, to put in the

7    transfer paperwork.

8        Q.   His sole connection to this is -- to put in

9    papers for transfer out of the command?

10        A.   Oh, no.  I don't know what, like, his specific

11    task is.

12        Q.   But your contact with him, it was solely --

13        A.   Oh, yeah.  Yes.

14        Q.   -- in connection with filing --

15        A.   He directed me to whatever form it was that I

16    used.

17        Q.   The 49 or the 57?

18        A.   Yes.  Yeah.  Yes.  Excuse me.  And that's

19    pretty much all the contact I had with him about this

20    issue.

21        Q.   Now, we were talking about the postings on

22    your locker, and you don't recall when the first one was

23    there?

24        A.   No.

25        Q.   Do you recall how long, over what period of

D. ATTALI

1    time were these postings on your locker?  Was it -- what

2    I'm trying to get at is:  The way the picture appears of

3    your locker -- and we can look at the exhibit.

4         A.    Please.

5         Q.    I'm directing your attention to Plaintiff's

6    Exhibit 6, and I'm going to go to the second to the last

7    page, which shows a view of your locker and the face of

8    your locker; is that correct?

9         A.    Yes, it is.

10        Q.    And the ads there, the supermarket's circular

11   is there.  They are posted on the locker.  How long had

12   they been on your locker?

13        A.    These specific ones that I'm looking at here

14   on this picture, I don't have a specific time frame.

15   I'm not going to say it was there for a week, a month,

16   but this was there definitely a few weeks.  There was

17   additional stuff, but I took it off, and then other

18   stuff appeared and other stuff, and this was the last

19   stuff.

20        Q.    You were never able to determine who posted

21   things on your locker?

22        A.    No.  I never witnessed anybody put it there.

23        Q.    Well, apart from witnessing, did you -- from

24   any manner, did you -- were you able to ascertain who

25   posted things on your locker?

D. ATTALI

1      A.    No.

2      Q.    But you say that you would take it down and

3   then it would reappear?

4      A.    Yes.

5      Q.    How quickly after taking it down did more

6   things appear?

7      A.    I don't know.

8      Q.    Did there come a point where you thought,

9   "Well, it's going to come back.  I'll just leave it

10  there"?

11     A.    I don't recall what was going through my mind

12  about these, the cutouts, the shopping cutouts.

13     Q.    What was your understanding about the rules,

14  about what could be posted on a locker?

15     A.    I don't know.

16     Q.    Well, did you think you could post anything on

17  your locker?  Could you post pictures of your family on

18  the outside of your locker?

19     A.    I couldn't say.

20     Q.    Well, on your locker, you have a National

21  Rifle Association sticker, correct?

22     A.    Yes.

23     Q.    Did you post that?

24     A.    No.

25     Q.    That was there when you arrived?

D. ATTALI

1        A.   It wasn't there when I arrived.  I don't

2   recall when it appeared on the locker, but it was.

3        Q.   Well, this was a new command that was formed

4   in or around July of 2011, and prior to that it used to

5   be Staples.  So when you came on, did you have a brand

6   new locker?

7        A.   Yes.

8        Q.   And did you have that locker throughout the

9   time you were at the command?

10        A.   Yes.

11        Q.   So is it fair to say that this was your locker

12   from the time it was brand new to the time you left?

13        A.   Yes, it was.

14        Q.   And you don't know who put that National Rifle

15   Association sticker on it?

16        A.   Nope.

17        Q.   And the sticker above it of the Butthead

18   with --

19             MR. AVALLONE:  Uncle Sam?

20        Q.   -- Uncle Sam cap, did you put that there?

21        A.   No.

22        Q.   Someone else posted that?

23        A.   Well, yeah.  It wasn't me.

24        Q.   All right.  And below that, there appears to

25   be, I guess, a circular for Cam; is that correct?  Can

D. ATTALI

1    you tell?

2         A.    I think so.

3         Q.    And below that, there is another one.  Do you

4    know what that is?

5         A.    Yeah.

6         Q.    What is that?

7         A.    That's a -- it's a prayer.  I'm not sure what

8    it is, which one or anything like that.

9         Q.    But it's in Hebrew?

10        A.    Yes.

11        Q.    And did you post that?

12        A.    I don't remember.

13        Q.    Well, is it offensive?

14        A.    No.

15        Q.    Can you read what it says?

16        A.    No, not really.

17        Q.    You think it's a prayer, though?

18        A.    Yeah.

19        Q.    Is it a well-known prayer?  Is that why you

20    say it's a prayer?

21        A.    No.  I'm pretty sure I remember reading it a

22    long time ago.  I think under it, there is like a little

23    writing, you know.  For example, in Hebrew it says,

24    like, Genesis, let's say, Chapter 21, Verse 13, I think,

25    for example, like that.  I don't remember specifically

D. ATTALI

1   which one or what.

2        Q.    Can you tell what -- there are two men

3   pictured in that?

4        A.    Yes, I believe so.

5        Q.    And can you tell what they're doing?

6        A.    No idea.

7        Q.    Are they holding something?

8        A.    Possibly.

9        Q.    Can you tell what it is?

10       A.    A rifle.

11       Q.    It does look like a rifle, correct?

12       A.    Yeah.

13       Q.    But you think it's a prayer as opposed to some

14   other message?

15       A.    Oh, yeah.

16       Q.    And on the right-hand side, as you face the

17   locker, there are -- going from top down, there is some

18   more supermarket circulars?

19       A.    Yes.

20       Q.    The second one is the circular for Jerusalem

21   Cafe?

22       A.    Yeah.

23       Q.    Have you ever been to the Jerusalem Cafe?

24       A.    No.

25       Q.    Do you know what it is?

D. ATTALI

1      A.    Cafe, I assume, but, no, I've never been there

2  before.

3      Q.    Well, does it cater to Jewish food?

4      A.    It sounds like it's kosher.

5      Q.    And below that, there is some -- another --

6  opposite the "Police.  Don't move" sticker --

7      A.    Yeah.

8      Q.    -- there is another sticker.  Do you recognize

9  that one?

10     A.    I recognize it, but I don't remember what it

11  was, as in...

12     Q.    Is it something you posted?

13     A.    I don't know.  I just recognize it.  It's

14  familiar to me, but I just don't remember what it was

15  exactly.

16     Q.    So it's something you might've posted?

17     A.    I don't know.  I won't say that.

18     Q.    Well, did you ever post anything on your

19  locker?

20     A.    Yes.  I posted my "Police.  Don't move"

21  sticker, gun safety, and the proper tactics.  Well, I

22  actually I replaced the sticker myself.

23         MR. AVALLONE:  "No choice"?

24         THE WITNESS:  Yes.

25     Q.    Do you recall seeing the text -- we can pull

D. ATTALI

1    it out.  But there was a text from you to Collazo about

2    getting a copy of the OGA and putting it on somebody's

3    locker?

4        A.    Yes, I do recall.

5        Q.    What do you recall about that?

6        A.    I don't remember which officer it was from the

7    night shift, but I think they had an OGA color, and they

8    didn't know -- I guess you've got to fill out the UF-61,

9    which is like the report, the initial crime report.  So

10   I think we were going to print it out and leave it on

11   his locker, so we got it because I think we heard the

12   other color on the radio.

13       Q.    OGA stands for Obstruction of Governmental

14   Administration?

15       A.    Yes.

16       Q.    Was it your sense that he didn't know that?

17   Why would you want to print it out?

18       A.    Because everybody knows what the term says.

19   But when you need it to write it up -- UF-61, a lot of

20   times you have these flash cards that they give you that

21   you receive with your memo book inserts, and, you know,

22   for robbery, it gives you the narrative you're supposed

23   to use in the complaint:  At T.P.O., I, officer,

24   whatever, did observe defendant or, you know, commit,

25   you know, like that.

D. ATTALI

1    Q.    Okay.  So let me understand the context.  So

2  you're saying that, if I understand this correctly, on

3  some midnight tour on which you were on the FOD

4  telephone service desk, you heard that someone made an

5  OGA color and you thought it would be helpful to have

6  somebody print out the law and post it on his locker?

7    A.    Well, not post it, like scotch-tape it like

8  that.  Either leave it on the locker or, you know, fold

9  it, shove it into the hole, so when they get to their

10  locker, they're able to pull it out.  But, no, there was

11  no malicious intent in what we were discussing.

12    Q.    Did you ever post anything on anyone else's

13  locker?

14    A.    No.

15    Q.    Did other people in the WTCC, in the large

16  locker room where your locker was located, have material

17  posted on their locker?

18    A.    Yes.

19    Q.    And they had material posted on their locker

20  other than the three stickers -- the stickers "Police.

21  Don't move," gun safety, and "Proper Tactics Save

22  Lives," correct?

23    A.    Yes, they did.

24    Q.    Those three stickers are on everybody's

25  locker?

D. ATTALI

1      A.   Correct.

2      Q.   And then officers had additional things posted

3  on their locker?

4      A.   Yes.

5      Q.   Of the same nature stickers, National Rifle

6  Association, patriotic stickers, whatever, correct?

7      A.   Yes.

8      Q.   Did you ever tell anybody outside of the

9  command, family, friend, that, "I've got these postings

10  on my locker of salami and ham and bacon circulars and

11  really offensive stuff, and I don't know what to do"?

12      A.   Yes.   I believe I mentioned it to my wife a

13  few times that they're posting bacon advertisement on

14  purpose, because they knew I do not eat pork.   It's just

15  there to bother me.

16      Q.   Well, you say your wife.   Was she your wife at

17  the time you told her?

18      A.   Yes.

19      Q.   And you got married on March 4th, 2014,

20  correct?

21      A.   Yes.

22      Q.   And you don't recall any conversation with

23  anyone prior to that or other than her?

24      A.   I do not recall any other prior conversation.

25      Q.   Now, let's talk about the text messages.   At

D. ATTALI

1    the time these text messages were going back and forth

2    on the midnight tour, between yourself and other

3    officers, everyone had a private cell phone, correct?

4         A.   Yes.

5         Q.   There was no department-issued phones while

6    you were at the WTCC, correct?

7         A.   Correct.  For officers, at least.  Possibly

8    lieutenants, maybe they had a BlackBerry.  I don't

9    remember exactly.

10        Q.   But for non-supervisory officers, it was their

11   own cell phone or what?

12        A.   Yes, their own cell phones.

13        Q.   Did they have radios?

14        A.   Yes.

15        Q.   So they had a radio and they could call you on

16   the desk, correct?

17        A.   Yes.

18        Q.   You could remain in contact with them all

19   through the night on the radio?

20        A.   Yes.

21        Q.   Did you have a hard line?  You answered a hard

22   line phone at the desk, too?

23        A.   Correct.

24        Q.   And to the extent you knew their cell phone

25   numbers, you could call them on that hard line, correct?

D. ATTALI

1    A.    Yeah.

2    Q.    When did you start creating group text

3  messages with the people who were on patrol on the

4  midnight tour?

5    A.    I'm not sure I understand.  Can you please

6  rephrase?

7    Q.    Okay.  Let me back up, then.

8          Did there come a time when you would create a

9  group text on your cell phone and send it out to the

10  people on that tour on a particular night?

11    A.    I don't believe so.  My phone at that time was

12  not able -- a lot of people had iPhones and I did not

13  during that whole period.  And I was not able to send

14  group texts because of, I guess, iPhone somehow.  It's a

15  different phone of some sort.  Well, it's a different

16  phone, obviously, but, yeah, I was not able to send, as

17  far as I recall.

18    Q.    Am I to understand that the text messages that

19  had been marked as an exhibit -- let's look at that.

20  Plaintiff's Exhibit 8, that -- well, let me back up.

21          Have you seen Plaintiff's Exhibit 8?  Maybe

22  not in this form, but you've seen all the text messages

23  that are grouped in here?

24    A.    Yes.  At one point or the other, I have gone

25  over them.

D. ATTALI

1    Q.    And are there more that haven't been produced?

2    A.    No.

3    Q.    I mean, more text messages of any kind?

4    A.    No.

5    Q.    Containing non-defamatory material,

6    non-derogatory material?

7    A.    No.

8    Q.    So on the first page, there appears to be a

9    message from Officer Delbrocolo, correct?

10   A.    Yes.

11   Q.    Is that part of a group text or is that just

12   text messages that Delbrocolo sent you, to you alone?

13   A.    I believe this is what he had sent me.

14   Q.    To you alone?

15   A.    Maybe other people received it as well.  I

16   don't know.

17   Q.    No.  From what you understand, it was a

18   message directed only to you?  It's not part of the

19   group; it wasn't going to Mergeche and Hamilton and

20   other people?

21   A.    I believe, yes, it was sent to only me, but

22   then, again, if this was sent to other people, my phone

23   would not let me know that it was -- I'm one out of

24   eight people in the chat.

25   Q.    But as you sit here today, you have no

D. ATTALI

1    knowledge or information that this was anything other

2    than a message sent by Delbrocolo to you?

3         A.    Yes.

4         Q.    If we just start going through it, is that

5    true of all these messages that they -- until we get

6    to -- until we get up to page 21.   There is a little

7    number on the top.

8         A.    It seems the same as the other ones.

9         Q.    Right.

10        A.    Are we on the same one?

11        Q.    Well, 21 is a text that says, "Who says Jews

12   don't eat bacon?"

13        A.    Yes.

14        Q.    But all of those, up to that point, appear to

15   be messages sent by Delbrocolo to you alone, not part of

16   any group text?

17        A.    I assume, yes.

18        Q.    And 22 is -- just appears to be a blow-up of

19   what was incorporated in 21; is that right?

20        A.    Yes.

21        Q.    And then going on, then with 24, 25, if you

22   keep going until we get to page 40.   So up through 39,

23   these, again, are all messages from Delbrocolo to you?

24        A.    Yes, I believe so.

25        Q.    And then 40 is a message from -- or purports

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

D. ATTALI

1    to be a message from Sullivan to you?

2        A.    Yes.

3        Q.    And did you understand that to be a message

4    just from Sullivan to you?

5        A.    At this point, I don't remember, but from what

6    it looks like on the paper, yes.

7        Q.    But as I asked you before, do you have any

8    knowledge or information that this is part of a group

9    text as opposed to a message directed only to you from

10   Sullivan?

11       A.    At this point, yes, I believe it's directed at

12   me, too, from Sullivan.

13       Q.    And that's true up through page 46, correct?

14       A.    Yes.

15       Q.    Now, let me ask you.  So this is taken off

16   your phone.  And let's go back to Delbrocolo for a

17   second.  You have his cell phone.  And he is sending you

18   these horrible text messages.  You could block the

19   calls, correct?

20       A.    Technically, yeah, you can block anyone's

21   number.

22       Q.    And this is the man you say was a racist who

23   from day one had nothing nice to say to you, and yet you

24   have his cell phone number saved as a contact in your

25   phone, correct?

D. ATTALI

1          MR. AVALLONE:  Just note my objection.

2     A.    Yes.

3     Q.    Did you ever attempt to block him?

4     A.    No.  Why would I?

5     Q.    Why would you?

6     A.    You need -- you need to have his contact.

7     Q.    You had a radio, correct?

8     A.    Yes, but, you know, unofficially, this is how
9 they would tell you, you know -- or I'd say, "You've got
10 to move your car.  The 1st precinct is going to tow it."
11 That's not something that you put over the radio.
12 That's something, you know, you text to them, "2062 or I
13 have post 13."  These are things that they would text
14 you.

15     Q.    Well, you also texted them that Sergeant
16 Porcelli is making rounds, correct?

17     A.    Yes.

18     Q.    Lieutenant Chang is going out now, correct?

19     A.    Yes.

20     Q.    And you wouldn't post that over the radio,
21 correct?

22     A.    Correct.

23          MR. GARBER:  I'm going to take a five-minute
24     bathroom break.

25          MR. SINGLETON:  Let's take a break.

D. ATTALI

1          (Whereupon, a short recess was taken from
2      12:10 p.m. to 12:17 p.m.)
3  BY MR. SINGLETON:
4          Q.    So we were up to page 40.  Go to page 41 now.
5  Now, P.O. Sully, that refers to Sullivan?
6          A.    Yes, it does.
7          Q.    Now, you said you never had any -- you didn't
8  like Delbrocolo at all.  What about Sullivan?
9          A.    Well, I shouldn't say I didn't like Delbrocolo
10  at all.  He hated me.  But what was the question, again?
11  I'm sorry.
12          Q.    Thank you for the correction.
13                Did you like Delbrocolo?
14          A.    No.
15          Q.    Was he nice to other people?
16          A.    Yes.
17          Q.    Do you think he just had it out for you?  Was
18  it because you were Jewish or because he just didn't
19  like you?
20          A.    Well, I believe it was because I was Jewish,
21  but that's what I believe.  I don't know what he is
22  thinking.
23          Q.    Did you ever have any incident with him, you
24  know, anything -- any unpleasant experience with him?
25          A.    With who?

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

D. ATTALI

1    Q.    With Delbrocolo, apart from the anti-Semitic

2   remarks, or was there something else that happened?

3    A.    Yes.

4    Q.    What?

5    A.    On a few occasions, while I was at the FOD, he

6   would throw matches at me, and I can't give you the

7   specific quote of what he was saying.  It was something

8   to do with Jews go up in fire quick, ashes, something to

9   do with ashes.  He would throw matches at me.  He lit

10  matches.  He would pass gas on me with references to gas

11  chambers, "You should be used to it."  On multiple

12  occasions, he threw change at me, whatever it was,

13  pennies, quarters, saying, "Can a Jew smell it?" or,

14  "Can you resist it?"  So, yes.

15   Q.    Right.  But those are all anti-Semitic

16  remarks.  I'm asking, was there any other incident that

17  you can recall with Delbrocolo that may have caused him

18  to do this to you?

19   A.    No, nothing that I know of.

20   Q.    Now, on page 41 it says, "P.O. Sully."  Did

21  you call him Sully?

22   A.    I don't remember what I called him.  It's

23  easier to type.

24   Q.    Well, you're not Irish, are you?

25   A.    No.

D. ATTALI

1       Q.    And so to refer to Sullivan as Sully, I mean,

2    that -- Sully is a nickname for Sullivan.  But is that a

3    nickname you heard before, or did other people refer to

4    him as Sully?

5       A.    That's what everyone referred to him as, as

6    Sully.

7       Q.    So other people in the command called him

8    Sully?

9       A.    Yeah.  Yes.

10      Q.    Let me ask you:  Did you have every officer --

11   there were 15 or so in the command in your platoon.  Did

12   you have all their cell phone numbers in your contact

13   list?

14      A.    Yes.

15      Q.    Where did you get their cell phone numbers?

16      A.    They gave out sheets with everyone's platoons

17   with their cell phone numbers as well as at the FOD at

18   the time, right by my head on the wall, it was

19   scotch-taped to the wall with everyone's squads, names,

20   phone numbers.

21      Q.    And if we go on through -- up to page 47,

22   those are all texts from Sullivan, correct, not

23   including 47 but up to 47?

24      A.    Yes.

25      Q.    And 47 comes from P.O. Joe.  Who is that?

D. ATTALI

1      A.    That would be Beneduce.

2      Q.    Now, is there a reason why you referred to

3   Beneduce by his first name as opposed to his last name?

4      A.    Yes.   Everyone referred to him as Joe, so P.O.

5   Joe.   Because P.O. was police officer.

6      Q.    Right.

7      A.    Assuming you're looking up in your phone other

8   cops' contacts, you know, you just go P.O., and you're

9   in that area.

10     Q.    Correct.

11     A.    But, no.   That's what everyone referred to him

12  as, Joe, so.   The same idea with Sullivan.

13     Q.    Well, certainly Joe is more familiar as the

14  first name than the last name, and you referred to

15  Delbrocolo formally, Delbrocolo.   You didn't call him

16  P.O. Chris, right?

17     A.    No, I didn't.

18     Q.    Were you friendly with Beneduce?

19     A.    No.

20     Q.    And Joe refers to Beneduce?

21     A.    Yes.

22     Q.    And so we have three pages of text messages

23  from Beneduce, and then we're back to Delbrocolo on a

24  different phone, is that correct, for three pages?

25     A.    Yes, I believe so.

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

D. ATTALI

1     Q.   Now, page 52, we have a group message:

2  P.O. Xue, P.O. Miranda, P.O. Something and so on.  Do

3  you -- this is off your phone, correct?

4     A.   Yes.  This is a screenshot from my phone.

5     Q.   And this is the phone that would tell you

6  there was group messaging going on?

7     A.   I suppose so.

8     Q.   And let me understand, did you create -- ever

9  create groups to keep in touch with people who were on

10  duty on a particular night?

11     A.   I don't know.  I don't remember.  You're

12  asking me a minor detail from years ago that -- I don't

13  know.  I couldn't say yes or no.

14     Q.   Well, you might have a recollection of having

15  created the group?

16     A.   I don't.

17     Q.   Who did Stew refer to?

18     A.   Stew would be Officer Sztukowski.  How do you

19  spell his name, I don't know.

20     Q.   Why don't you refer to the personnel list.

21     A.   Oh, I found it.

22     Q.   And?

23     A.   Do you want me to spell it?

24     Q.   Yeah.  Please, for the record.

25     A.   S-Z-T-U-K-O-W-S-K-I.

D. ATTALI

1      Q.    Now, this particular one says, "1st Precinct

2    called.  They are tossing cars for movie shoot between

3    North Moore, Varick to Hudson."  Did I read that

4    correctly?

5      A.    Yes.

6      Q.    And P.O. Trancoso responds with, I guess, an

7    image of a face with its eyes covered, correct?

8      A.    Yes.

9      Q.    What did you understand that to mean?

10      A.    I don't know.  Just nothing.

11      Q.    The speaker in the first one, "1st Precinct

12    called.  They're tossing cars for movie shoot," is that

13    you?  You're the speaker, correct?

14      A.    I believe so.  I think I meant moving, towing.

15      Q.    You mean towing instead of tossing.

16      A.    Yeah.  I'm pretty sure that's --

17      Q.    Autocorrect?  Is that an instance of

18    autocorrect?

19      A.    Maybe.  I don't know.  You mean, when the

20    phone --

21      Q.    Changed the words on you?

22      A.    I don't remember.  I don't know.

23      Q.    Now, in the next message on page 53, it shows

24    that there is a -- Sullivan posted a picture of Hitler

25    giving the salute, correct?

D. ATTALI

1        A.    Yes.

2        Q.    And Trancoso responds "LOL"?

3        A.    Yes.

4        Q.    Did Trancoso ever make anti-Semitic remarks

5    towards you?

6        A.    No.

7        Q.    And is 54 just a continuation of what's on 53?

8        A.    Yes, I believe so.

9        Q.    So when it says, "He is just pointing out

10   which ones to move," is that referring to the cars

11   they're towing?

12       A.    I believe he was trying to say, "Oh, Hitler is

13   pointing which cars to be moved."

14       Q.    That's what I'm trying to understand.  So this

15   is all in a context of a message you started out saying,

16   "They're tossing cars -- they're towing cars for movie

17   shoot," and somebody puts a post as Hitler and he's

18   saying, "He's just pointing to which ones to move,"

19   correct?

20       A.    I suppose.

21       Q.    And Trancoso responds "LMAO."  What did you

22   understand that to mean?

23       A.    Well, now I know what it means, but I guess he

24   is just laughing at Sullivan's response.

25       Q.    And LMAO means "laughing my ass off"?

D. ATTALI

1      A.   Yes, I believe so.

2      Q.   Now, on page 55, it appears this is a

3   different group.  This includes as a second in the

4   group -- first in the group is no longer Stew.  It's

5   P.O. Sully, then P.O. Murray.  That's Christopher

6   Murray, correct?

7      A.   Yes.

8      Q.   And we don't know who comes after that.  That

9   first message, "Supervision tonight.  I already got

10  scratched two times tonight."  Is there any way to tell

11  who the speaker is from the context?

12     A.   No.  I'm sorry.  I do not know.

13     Q.   And your text at 3:25 a.m. on the pages --

14  "INSP" -- inspector?

15     A.   Yes.

16     Q.   "At command."  What does that mean?

17     A.   That lets the sergeants know, let yourselves

18  know the inspector is in.

19     Q.   Meaning Burke?

20     A.   I don't know if it was Burke or the previous

21  one.  I don't know when it was done.

22     Q.   But it would be one of the two?

23     A.   One of the two, yes.

24     Q.   And given that this is a message in 2014,

25  around April, it's likely to be Burke, correct?

D. ATTALI

1    A.   Yes, I suppose.

2    Q.   And you're on modified duty; you're on

3  telephone service, correct?

4    A.   Restricted.

5    Q.   Restricted?

6    A.   Yeah.

7    Q.   By the way, what's the difference between

8  modified and restricted or limited?

9    A.   So limited is -- you got me.  I think limited

10  is if you're just coming off being sick, possibly, and

11  you're about to go back full duty any day.  And

12  restricted means you're restricted, let's say, you

13  shouldn't be driving one of the RMPs or handling a

14  prisoner.  And modified would be, like, if you're

15  stripped of your gun and shield, you know, if you did

16  something wrong.

17    Q.   Well, let me ask you:  You were complaining

18  that you had a line-of-duty injury to your shoulder and

19  you failed the gun test several times, correct?

20    A.   Yeah.  Well, I don't know how many times, but,

21  yes, I did fail.

22    Q.   At least twice?

23    A.   Yes.

24    Q.   And that's because you're required to shoot

25  with both hands?

D. ATTALI

1      A.    Yeah.  Yes.

2      Q.    And you're right-hand dominant, correct?

3      A.    Yeah.  Yes.

4      Q.    And you injured your left hand, correct?

5      A.    Yeah.

6            MR. AVALLONE:  Just note my objection as to

7      what was injured.  You said "your left hand."

8      Q.    You claimed an injury to your left wrist and

9      shoulder, correct?

10     A.    Yes.

11     Q.    As a result of effecting an arrest in 2009,

12     correct?

13     A.    Yes.

14     Q.    And when you failed the gun test, did they

15     take away your gun?

16     A.    They took away my gun at a certain point.  I

17     just don't remember when.  Maybe at the medical

18     division.  Yeah, I gave it to somebody at the medical

19     division, but I don't know who it was at this point.

20     Q.    And because you couldn't pass the gun test,

21     you were not qualified to go on patrol, correct?

22     A.    Yes.

23     Q.    And was it your understanding that if you fail

24     to qualify -- if you continue to fail to qualify, there

25     would come a point in time when you would be -- your

D. ATTALI

1   employment would be terminated or the process to

2   terminate your employment would begin?

3        A.   No.  I never -- I did not know that.

4        Q.   Did you think you could go on on limited duty

5   indefinitely?

6        A.   No.  I was planning on going back full duty.

7   I was telling one of the lieutenants that went with me

8   to do the gun test or after.  I was getting better,

9   slowly but surely.  The first time I went to re-qual, I

10  think after two rounds I couldn't lift a gun up anymore.

11  And I told him, I said, "Hey, look at my range

12  qualifications."  You'll see literally two out of 50

13  shots going -- don't know the exact amount -- to 12, and

14  then all the way down to the last time I qualified, I

15  only missed two shots.  Next time I go -- I'm getting

16  better, slowly but surely.  I think I'll pass.

17       Q.   On May 15th of 2014, you fired 20 rounds and

18  scored 12.  And the next month, on June 21st, you fired

19  50 rounds and scored 60.  Is that what you're talking

20  about?

21       A.   Yes, I believe so.

22       Q.   And that's only in a course of a little bit

23  more than a month.  Were you doing physical therapy?

24       A.   At that point, no.  I did after the surgery,

25  but not at that particular time.

D. ATTALI

1    Q.    Is it correct that you would do -- you've

2  already said you would do weightlifting and you would go

3  to the gym, correct?

4    A.    Yes.

5    Q.    And free weights?

6    A.    A little bit of everything.  Cardio, running.

7    Q.    But free weights, also?

8    A.    Yeah.

9    Q.    Dumbbells?

10   A.    Not so much.

11   Q.    Kettlebells?

12   A.    No, no.  Like, Smith machine.  I don't know if

13  you know what that is.

14   Q.    Yes.

15   A.    Yeah.  Well, a lot of -- I like the Smith

16  machine a lot, because it makes it easier, you know.  It

17  takes, like, the weight off.

18   Q.    A Smith machine, for those who don't know, is,

19  basically, a stationary fixed bar that you raise over

20  your head with weights on both sides.  Like, lifting a

21  barbell in a stationary, straight way?

22   A.    Yes.  It's assisted lifting.  Like, you don't

23  feel the real weight of what's on the barbell,

24  because -- I don't know -- whatever, the springs or

25  whatever helping you throw it up.  I like the Smith

D. ATTALI

1   machine.

2        Q.   So you were getting better.  You would do

3   pull-ups and push-ups in the command?

4        A.   No.

5        Q.   Never?

6        A.   No, not at all.

7        Q.   So if someone said, "I'd see him do push-ups

8   and pull-ups in the command," they would be lying?

9        A.   Definitely.  Just like they lied, like, I

10  never -- they never sent me any of this stuff.  Why

11  would I believe a word they've got to say?

12       Q.   What do you mean they never sent --

13       A.   Oh, they never sent Attali none of this.  I

14  never said nothing to him or I'll see him in the gym.  I

15  don't believe a word they say.

16       Q.   You're talking about the five officers that

17  were charged?

18       A.   Yep.  Collazo, too.

19       Q.   Collazo, too.  Anyone else you think would

20  lie?

21       A.   Why wouldn't they all?  They're all trying to

22  protect their fellow officers.  It's one against eight

23  and the two delegates, you know.

24       Q.   Okay.

25       A.   But to answer your original question, no.

D. ATTALI

1          We had a joined gym between the 1st Precinct

2     and us, but I never used it.  And, again, at that point,

3     I was not working out for quite some time.

4          Q.   Well, did you ever go for physical therapy and

5     were told you've got to do these exercises to strengthen

6     your shoulder?

7          A.   Yes.

8          Q.   And over what period of time did you do that?

9     Was it just shortly after you had the laparoscopic

10    surgery to your shoulder?

11         A.   Yes.  I went to physical therapy.

12         Q.   For how long?

13         A.   I don't remember.

14         Q.   Two times a week, three times a week, once a

15    week, once a month?

16         A.   Possibly, two times a week.  I remember it was

17    in -- it was somewhere here in the city.  I don't

18    remember how many times I went.

19         Q.   And you think it was two times a week over

20    some period of time?

21         A.   Yeah.

22         Q.   Going back to these messages, if we -- these,

23    again, appear just to be now from Delbrocolo up to

24    page 60, correct?

25         A.   Yes.

D. ATTALI

1      Q.    And then at 61, we have a group message,

2   again, with now Ramirez and Mergeche and others,

3   correct?

4      A.    Yes.

5      Q.    And it appears Drummy is in this group,

6   because it's a message from him?

7      A.    Yes.

8      Q.    And Sully is in the group?

9      A.    Yes.

10     Q.    Now, looking at this, it says -- Sully says --

11  everybody texted you every 45 minutes, and he does have

12  a 10:52.  And four minutes later, Mergeche says "LOL,"

13  correct?

14     A.    Yes.

15     Q.    And then approximately seven minutes later,

16  11:03, Drummy, spelled D-R-U-M-N-Y [sic] -- referring to

17  John Drummy, to your understanding?

18     A.    Drummy, I don't remember his first name, but

19  there was only one Drummy at the command.

20     Q.    And he sends a picture.  What do you

21  understand that to be?

22     A.    It was a video.

23     Q.    Oh, it was a video?

24     A.    Yeah.

25     Q.    Did you save the video?

D. ATTALI

1    A.   Yeah.  I mean, it was there under this text.

2    Q.   And what was this video of?

3    A.   So the video -- I'm somewhat familiar with the

4    label on the top left.  It's from -- I shouldn't say

5    familiar, but it's from Hamas TV or it's called Al-Aqsa

6    TV.  Specifically, it's a Palestinian news channel known

7    to be -- to have a lot of anti-Semitic -- whether it's

8    Mickey Mouse shows or whatever.  And this was -- what I

9    took from it was -- I guess it was a guy trying to act

10   like a rabbi.  I don't remember exactly what he was

11   doing in the video, but I took it in a negative way, as

12   in it's not a friendly video.

13   Q.   Do you remember what was on the video?

14   A.   I don't remember exactly what the gentleman

15   that you see there in the clip was doing.  At this

16   point, I don't remember.

17   Q.   And then Mergeche says, "Wow."  Did you

18   understand him to be shocked by the video?

19   A.   That's what my understanding of it was.

20   Q.   And then on the last page, we have a different

21   group again.  Did the group change each night depending

22   on who was on the tour?

23   A.   I assume, yes, because not every day it's the

24   same squads in.  Because I have my set schedule, you

25   know, I do 5/2, five days a week, two off/five days.

D. ATTALI

1    And in other squads, they do 5/2, 5/3.  So everybody

2    rotates through your schedule or me through theirs,

3    should I say.

4         Q.   Right.  So the composition of the group is

5    changing every night?

6         A.   Yes, depending -- yeah.  It could be the same

7    for three nights in a row and then different for two,

8    yes.

9         Q.   Now, in this last one, it says from Sullivan,

10   the last message in this exhibit -- Sullivan is saying,

11   "You're a dirty spy, Attali."

12        A.   Yes.

13        Q.   And before that, he says, "Day late and a

14   dollar short."  And the first message is from you.  It

15   says, "Inspector heading out," at 1:29 a.m.  That's

16   Inspector Burke?

17        A.   If the date falls into when he was there,

18   then, yes.

19        Q.   My understanding is that Burke works day tour,

20   correct?

21        A.   I believe so.

22        Q.   And so what would occasion him to be out at

23   1:30 in the morning?

24        A.   I don't know.  I guess they once in a blue

25   moon -- like I said, I don't know how they schedule

D. ATTALI

1  their days, but once in a blue moon, I guess, he would

2  show up.  Just like how the captain once every few

3  months has to do a night tour, just to be there during

4  the night.

5       Q.   And was that true of Burke, that he had to be

6  there once -- on occasion during the night?

7       A.   Well, if it weren't for these texts, I don't

8  remember him being there.

9       Q.   But your purpose in sending the text is to get

10  everybody -- not use the radio and say, "Hey, there is a

11  sergeant or an inspector or someone is making tours.

12  Heads up"?

13       A.   Yes.  I wouldn't use the radio for that.

14       Q.   You're, basically, saying, "If you're

15  sleeping, wake up."

16       A.   No.  Just heads up, "Inspector is out.  Be on

17  point."  You couldn't use the radio for something like

18  that.

19       Q.   And what did he mean, "Day late and a dollar

20  short"?  Did he already see the inspector?

21       A.   Possibly.

22       Q.   Like, you should've told me half hour ago?

23       A.   Possibly.  I don't remember this specific

24  conversation, but, again, that's what I'm gaining from

25  looking at it now.

D. ATTALI

1      Q.   And, "You're a dirty spy, Attali."  Did that

2  mean -- what did that mean to you?

3      A.   He'll send me the reference all the time of,

4  like, some Zionist scheme, to take over the world of

5  some sort or reference all the time to some book.

6           MR. AVALLONE:  Some book?

7           THE WITNESS:  Yeah, book.  He is always

8      talking about the elders or Zion or something,

9      "Zionist always taking over the media."

10      Q.   So you regard this text on page 62 to be

11  anti-Semitic?

12      A.   Yeah.  I think this text goes along with

13  another picture text that he had previously sent me.

14  It's here somewhere.  I passed through it.

15      Q.   Could you see if you can find it?

16      A.   Yes.  It's kind of like a CIA logo.  It's on

17  page 55.  I don't know where he received this picture

18  from, but to me, this and that are -- for him, same

19  topic.

20      Q.   I see.

21      A.   As in saying, "Oh, there is some Zionist to

22  take over the plan in the world that no one knows

23  about."

24      Q.   Okay.  And if that's true and this is all part

25  of the same night, page 55 is much later towards the end

D. ATTALI

1    of the tour, correct?

2        A.    Well, definitely, obviously, the time is

3    different, but, again, I don't know which day this is.

4        Q.    Well, is it possible that you say, "Inspector

5    heading back," and then at 2:19 you're saying,

6    "Inspector at command," meaning he is back in the house?

7        A.    Possibly.  Either that or it's a different day

8    and he came in.  I don't know.  I just don't remember

9    this night.

10       Q.    Now, these text messages that are collective

11   here, did you make screenshots of these messages?  Do

12   you know how this document was created?

13       A.    What did we do?  I don't remember exactly how

14   we did it, but I did it with my attorneys.  I don't

15   remember exactly how we got it in this format.  I just

16   remember showing it to them.  I don't remember how we

17   did it.

18       Q.    Speaking about your attorneys, you mentioned

19   Decolator.  They had stuff posted all over the precinct

20   if you need a lawyer, I guess, for anything.

21             But your present attorneys, did somebody

22   recommend them?

23       A.    How did I get their number?  I think I got it

24   from Cohen and Decolator.

25       Q.    You did?

D. ATTALI

1      A.   Yeah.

2      Q.   So you went back to those attorneys you'd used

3  before and they said --

4      A.   Yeah.  They gave them a quick brief of, you

5  know, encountering a lot of problems with people.

6      Q.   And did they say they had expertise in this

7  area?

8      A.   I don't remember the conversation I had.

9      Q.   All right.  I don't want to get into

10  conversation.  Sorry.

11          Let me ask you:  So it's your testimony that

12  when you went and filed the complaint with Sergeant Soto

13  at the OEEO, and you can refer to Exhibit 9.  This

14  was -- this is the complaint you made when you,

15  ultimately, went to see Sergeant Soto?

16      A.   Yes.

17      Q.   And did you fill that out in his presence?

18      A.   I don't know.

19      Q.   What's your recollection?

20      A.   Well, it's definitely my handwriting.  Yeah.

21  I just don't remember doing paperwork.

22      Q.   Where was Sergeant Soto located?

23      A.   I know One Police Plaza.

24      Q.   So you had to walk over from the --

25      A.   No.  I think I went on my day off.

D. ATTALI

1    Q.    You went in the daytime?

2    A.    Yeah.

3    Q.    And you say, "I'm always referred to as

4    'Jew/stupid Jew/dirty Jew,' nonstop comments of me being

5    Jewish as well as comments of Hitler and World War II,

6    concentration camps.  Various people as well as specific

7    individuals make these comments," correct?

8    A.    Yes.

9    Q.    Am I understanding correctly, you're saying

10   that at the time you made this complaint, it was just

11   that:  I was seeking general advices; how can I put an

12   end to this, and not necessarily to -- I mean, were

13   you -- what were you trying to do?  Get out of the

14   command, or had you made the determination that, "I'm

15   filing complaints against people," because you don't

16   name anybody in here.

17          MR. AVALLONE:  Just note my objection.

18   A.    Well, at this point I just wanted it to stop.

19   That's it.

20   Q.    But you don't name anybody specific here.  You

21   don't say Delbrocolo, Sullivan, Miranda, anybody.

22   A.    The writing here, no, but I don't remember

23   if -- well, yeah.

24   Q.    You think on the blocked out, you think you

25   named people there?

D. ATTALI

1    A.    Possibly.  I mean, you could see Delbrocolo

2    right on the bottom is written there.

3    Q.    Yes.

4    A.    And I don't know what's blacked out in the

5    other stuff.

6         MR. SINGLETON:  Let's mark this as the next

7         exhibit.

8         (Whereupon, the following document was marked

9         as Defendant's Exhibit J for identification as of

10        this date by the Reporter.)

11   BY MR. SINGLETON:

12   Q.    Let me show you what I've marked as

13   Defendant's Exhibit J.  It is your personnel profile

14   report for you.

15        Have you ever seen this document?

16   A.    No.

17   Q.    If you'll direct your attention to the third

18   page, page 3, Bates-stamp No. 1356 at the bottom.

19   A.    Yes.

20   Q.    It lists medical availability history records?

21   A.    Yeah.

22   Q.    It shows that on 11/19/2009, you were on full

23   duty that day and then went to limited capacity.  Is

24   that the date that you suffered a line-of-duty injury in

25   the course of effecting an arrest?

D. ATTALI

1    A.    It sounds about right.  Specific date, I don't

2  recall.

3          And what does this whole line-of-duty stuff

4  have to do with anything with the situation at hand?

5          MR. AVALLONE:  Just answer his questions.

6    A.    No.  I don't know.  Maybe; maybe not.  No

7  idea.  I don't remember.

8    Q.    Did you ever take the position that you had

9  been denied your claim for three-quarter disability

10  because of discrimination?

11    A.    Say that again.  I'm sorry.  Please repeat.

12         (Whereupon, the referred-to question was read

13         back by the Reporter.)

14         THE WITNESS:  No.

15    Q.    You, ultimately, filed a complaint with the

16  Equal Employment Opportunity Commission of the federal

17  government, correct?

18    A.    Yes.

19    Q.    And how did that come about?  Is that

20  something you did with your attorney?

21    A.    Yes.

22         (Whereupon, the following document was marked

23         as Defendant's Exhibit K for identification as of

24         this date by the Reporter.)

25

D. ATTALI

1    BY MR. SINGLETON:

2        Q.    And if you look at this and what I've marked

3    as Defendant's Exhibit K.  Is this a copy of the

4    complaint you filed with the United States Equal

5    Employment Opportunity Commission?

6        A.    If my signature is on it, then I suppose, yes.

7        Q.    And that is your signature on the last page?

8        A.    Yes.

9        Q.    And it indicates you signed it in the presence

10   of Rocco Avallone on July 18, 2014?

11       A.    Yes.

12       Q.    Well, if you go to -- starting with the third

13   page, which says, "I, David Attali," and then you go two

14   more pages and you see a list of one, two, three, four,

15   and five.  And five says, "The NYPD and the pension

16   board continue to deny my line-of-duty injury disability

17   pension retirement application despite medical records

18   that clearly show I am disabled due to a line-of-duty

19   injury I suffered in 2009.  I believe this is in

20   retaliation for having filed complaints with my

21   commanding officer and the OEEO against my supervisors,

22   who continue to bully me, my co-workers and union

23   delegates, who treat me with hatred and disgust simply

24   because of my religion, race, and national origin."

25            Did I read that correctly?

D. ATTALI

1    A.   Yep.  Yes, you did.

2    Q.   You read this before signing it?

3    A.   Possibly.

4    Q.   Possibly?

5    A.   Yep.

6    Q.   Did you understand you were swearing to the

7    truth of everything in this statement?

8    A.   Yes.

9    Q.   At the last line, immediately preceding your

10   signature, it says, "I have read and had an opportunity

11   to correct this affidavit and swear that these facts are

12   true and correct to the best of my knowledge and

13   belief"?

14   A.   Yes.

15   Q.   Is everything in that paragraph that I just

16   read true and correct, to the best of your knowledge and

17   belief?

18   A.   Yes.

19   Q.   You say you filed complaints against your

20   supervisors who continue to bully you?

21   A.   If that's what it says.

22   Q.   What supervisors bullied you?

23   A.   At this point, I do not recall.

24   Q.   Is it correct that in your complaint in this

25   action you do not claim that you were denied disability

D. ATTALI

1    retirement because of discrimination?

2         A.   Can you please read that?

3              (Whereupon, the referred-to question was read

4         back by the Reporter.)

5              THE WITNESS:   I don't know.  Maybe at that

6         time, while I was still in the police department, I

7         felt as if hate was coming from every angle.  You

8         know, if my sergeants don't do nothing and they

9         stand there when this guy day in and day out is

10        calling me, "You're a fucking kike."  Maybe that's

11        what I thought at that time was correct.

12        Q.   Right.  But a few questions ago, when I

13   started to go down this line, you said, "What does this

14   have to do with this?"  Meaning, your line of duty is

15   unrelated to this case, correct?

16        A.   I believe so.

17        Q.   So am I correct that you are not suing about

18   the line-of-duty disability denial in this case?

19        A.   I don't know.  You kind of lost me.

20        Q.   You're not sure what you're suing over?

21        A.   Oh, I know.

22        Q.   Well, are you suing about a denial of your

23   disability benefits?

24        A.   Am I suing for denial --

25             MR. AVALLONE:   Don't guess.

D. ATTALI

1     Q.   Are you suing in this case --

2     A.   Oh, no, no.

3     Q.   No?

4     A.   Not at all.

5     Q.   And you were advised, were you not, that if

6  you were unhappy with the determination by the NYPD that

7  you were not entitled to a three-quarter disability,

8  that you had a right to seek judicial review of that

9  determination, that you could go to court and say

10  they're wrong?

11     A.   No, I did not know that was an option.

12          (Whereupon, the following document was marked

13        as Defendant's Exhibit L for identification as of

14        this date by the Reporter.)

15  BY MR. SINGLETON:

16     Q.   I will show you what I've marked as

17  Defendant's Exhibit L.  It's a letter to you, addressed

18  to you, dated August 12th, 2016.  Do you recall -- it

19  was sent to you by certified mail/return receipt

20  requested.  Do you recall receiving this letter?

21     A.   No.

22     Q.   Is it your testimony you never received this

23  letter?

24     A.   Maybe I did; maybe I didn't.  I don't recall.

25  I don't remember.

D. ATTALI

1    Q.    Well, this letter advises you that your

2    application for disability retirement was denied by the

3    board of trustees --

4    A.    Okay.

5    Q.    -- of the police pension fund, correct?

6    A.    Yes.

7    Q.    And it says in the next paragraph that, "If

8    you're not happy with this decision, you may file an

9    Article 78 proceeding no later than four months from the

10   receipt of the letter," correct?

11   A.    Yes.

12   Q.    Did you understand what that meant?

13   A.    No.

14   Q.    Because I can show you other statements that

15   have similar language.

16        MR. AVALLONE:   Objection.

17   A.    Okay.

18   Q.    Did you understand that you could go to court

19   to challenge that determination?

20        MR. AVALLONE:   I'm going to object.

21        MR. SINGLETON:   That's all you get to say.

22   A.    Please say the question again.

23   Q.    You had applied for disability retirement,

24   correct?

25   A.    They put me in for disability retirement.

D. ATTALI

1    Q.    Right.  Because you couldn't qualify for a

2    gun, and they wanted to see if you could continue to

3    perform as a police officer, correct?

4          MR. AVALLONE:  Note my objection.

5    A.    Maybe the medical district doctor did.

6    Q.    Did there come a time when you put in your own

7    application for disability retirement?

8    A.    I don't know.  I always thought once it was

9    put in, it was put in by whoever the doctor was at the

10   medical district.

11   Q.    Did you believe you were entitled to

12   three-quarter disability retirement?

13   A.    I believe whatever their decision was is their

14   decision.

15   Q.    So you were happy whatever the outcome --

16   whatever they determined?

17         MR. AVALLONE:  Objection.

18   A.    I would've been happy if they would've

19   accepted my transfer and I would've still been a cop

20   right now.  That's what I would've been really happy

21   with.

22   Q.    Let me ask you about that.  You appeared on a

23   radio show, correct?

24   A.    Yes.

25   Q.    With -- am I pronouncing it right? -- Pesach

D. ATTALI

1  Kirschner and J. Eliana Liorit Brower?   Do you remember

2  that?

3       A.    I remember the radio show conference call.   I

4  don't remember their names.

5       Q.    It was BlogTalkRadio?

6       A.    If you say.

7       Q.    But you do recall going on a show?

8       A.    Yes.

9       Q.    And it was -- they were sympathetic to your

10  cause?   Is that fair to say?

11       A.    I don't remember.

12       Q.    Well, why did you go on that?   How did that

13  come about?

14       A.    It happened.   How exactly, I don't recall the

15  details.

16       Q.    Well, did they call you and say, "Hey, we saw

17  your lawsuit and we want you to come on and talk about

18  this"?

19       A.    I just don't know.   I just don't remember.

20       Q.    Do you recall them asking you in effect,

21  "Well, if you want to -- it's always been your dream to

22  be a police officer.   Why don't you go out to Nassau,

23  Suffolk, because they need officers.   With your

24  training, World Trade Center Command, you'd get a job."

25            Do you remember that?

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

D. ATTALI

1     A.   No.

2     Q.   Well, tell me.  What have you done, if

3  anything, to get other employment as a police officer?

4     A.   I called up to Englewood Police Department but

5  I missed their exam, and they said they won't give it

6  for another year and a half, but that was a while ago.

7  And then recently I applied to do the entrance exam in

8  the Tenafly Police Department.  It's T-E-N-F-L-Y [sic],

9  New Jersey.

10    Q.   You have specialized training as a result of

11 being in the World Trade Center Command, correct?

12    A.   Yes.

13    Q.   And that training is highly sought after by

14 other police departments, correct?

15         MR. AVALLONE:  Objection.

16    A.   Possibly.

17    Q.   Did you ever apply to Suffolk County?

18    A.   No.

19    Q.   Nassau County?

20    A.   No.

21    Q.   Rockland County?

22    A.   Maybe.  I don't remember.

23    Q.   Yonkers?

24    A.   No.

25    Q.   So you're saying you missed the test in

D. ATTALI

1    Englewood and you think you made a call to Tenafly?

2        A.   Oh, no.  I signed up.  Actually, the test is

3    coming up soon.

4        Q.   So you're all better now, correct?

5        A.   Yeah.

6            MR. SINGLETON:  With that, let's take a break

7        for lunch.

8            (Whereupon, a lunch recess was taken from

9        1:04 p.m. to 1:46 p.m.)

10           (Whereupon, the following document was marked

11       as Defendant's Exhibit M for identification as of

12       this date by the Reporter.)

13   BY MR. SINGLETON:

14       Q.   Let me show you what I've marked as

15   Defendant's Exhibit M, and this is Plaintiff's Initial

16   Rule 26 Disclosure.  This is not a document signed but,

17   I'll direct your attention.

18           Now, in A, it talks about names and addresses

19   of witnesses, and the fifth person listed is your wife,

20   Tamar Attali, and it says she has knowledge of emotional

21   and mental damages, personality changes, hostile work

22   environment, economic damages.

23           Is there anybody else who knows anything about

24   those subjects, to your knowledge?

25       A.   Specific details, besides from my attorneys,

D. ATTALI

1    no.  Unless they've seen it in the news.

2         Q.    In document B, on page 3, No. 13, you talk

3    about your W-2 for 2013, and that covers your employment

4    with New Amsterdam Management, or no?

5         A.    No.  In 2013, I was still a police officer.

6         Q.    Okay.  Did you get a W-2 from New Amsterdam

7    Management for 2014?  You were working there from

8    October, right?

9         A.    October 2014, no, I was not working for them.

10   I believe I was working for them -- I did get a W-2, but

11   I don't think it was 2014.

12        Q.    I'm sorry.  It would be 2015.  Right.

13        A.    I believe so.

14        Q.    Were you employed in 2014; just the job as

15   assistant property manager?

16        A.    No.

17            MR. SINGLETON:  Well, I call for the

18        production of W-2s and tax returns for 2014 to the

19        present, continuing demand.

20            Let's mark this.

21            (Whereupon, the following document was marked

22        as Defendant's Exhibit N for identification as of

23        this date by the Reporter.)

24   BY MR. SINGLETON:

25        Q.    I'll show you what I've marked as Defendant's

D. ATTALI

1    Exhibit N, and it's a copy of the stipulation and

2    confidentiality order entered in this case.

3              Have you seen this before?

4         A.   Not to my recollection.

5         Q.   Are you aware that we've marked certain

6    documents here?  And you'll see labels on them, various

7    documents say "confidential."

8         A.   Yes.

9         Q.   Are you aware that there is a confidentiality

10   order and that you're bound by and you cannot share that

11   information with anyone?

12        A.   Yes.

13        Q.   Okay.  Thank you.

14             I want to direct your attention to Plaintiff's

15   Exhibit 14.

16        A.   Thanks.

17        Q.   Do you recognize what is collected as

18   Exhibit 14?  Do you recognize it as text messages that

19   came from -- that came from you?

20        A.   Yes.

21        Q.   Now, on the first page -- this is a text

22   message dated January 27th, 2013, at 4:10 a.m.  And it

23   says, "Boo.  How do you spell Brooks?  LOL."  And it

24   indicates that you responded, a minute later, with

25   comment "N-GGR."

D. ATTALI

1        Is that a text you sent?

2    A.    Yes.

3    Q.    And Brooks is an African-American officer?

4    A.    Yes.

5    Q.    And given your sensibilities and feelings

6    about people hurling remarks against you, did you think

7    it's appropriate to call an African-American a nigger?

8        MR. AVALLONE:  Note my objection.

9    A.    No.  That's why I didn't.

10   Q.    That doesn't mean "nigger"?

11   A.    It does, but I did not feel comfortable

12   writing that.  The reason why Collazo had texted me

13   this, "Boo.  Yo, how do you spell Brooks?  LOL,"

14   obviously, he knows how to spell Brooks because he

15   spelled it right there.  The night or two nights before

16   this text, as I was telling you, at the FOD I have a big

17   board behind me.  Now, the board is cut up into a lot of

18   little squares with certain equipment listed and blank

19   spots and cars and equipment.

20       So Collazo had came in and he is standing at

21   the FOD.  He says, "Attali, you spelled Brooks' name

22   wrong."  I said, "How so?"  He took the eraser, erased

23   Brooks' name next to whatever Taser it was put up to,

24   and he wrote N-I-G-G-E-R.  So he put down the marker and

25   left.  I erased it, put Brooks' name back up there.